**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| MARYLAND STATE RETIREMENT AND PENSION SYSTEM, )<br><br>　　　　　　　　　　Plaintiff, )<br><br>　　vs. )<br><br><br>BP, PLC; BP AMERICA, INC.; BP EXPLORATION & PRODUCTION, INC.; ANTHONY B. HAYWARD; ANDREW G. INGLIS; DOUGLAS J. SUTTLES, )<br><br>　　　　　　　　　　Defendants. ) | **CIVIL ACTION NO. _____**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL**
**SECURITIES LAWS AND ENGLISH COMMON LAW**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION AND OVERVIEW ................................................. 2

II.  JURISDICTION AND VENUE ............................................................. 7

III.  PARTIES ................................................................................. 10

    A.  Plaintiff ...................................................................... 10

    B.  Defendants and Related Parties ........................................... 11

IV.  SUBSTANTIVE ALLEGATIONS ......................................................... 16

    A.  Prior Incidents of Safety Lapses ........................................... 16

    B.  The Baker Report ............................................................. 20

    C.  BP Pledged to Implement OMS and Formed Committees to
        Enhance and Monitor Process Safety ................................... 24

    D.  OMS Scope and Implementation ......................................... 27

    E.  BP Experienced Well Blowouts During The Relevant Period As
        The Result Of Faulty Cementing ......................................... 31

    F.  The Deepwater Horizon Disaster Establishes That "Process"
        Safety Improvements Were Not Being Implemented ................. 33

    G.  BP Has No Legitimate Spill Response Plan, Contrary to
        Defendants' Representations ............................................... 40

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
    STATEMENTS AND OMISSIONS OF MATERIAL FACTS DURING
    THE RELEVANT PERIOD ............................................................. 49

    A.  November 8, 2007 Statements [Misrep. G from Connecticut
        Complaint; sustained in Connecticut Order]............................ 49

    B.  February 22, 2008 Statements [Misrep. H in Alameda Complaint;
        sustained in Alameda Order] ............................................... 50

    C.  February 27, 2008 Statements [Misrep. I in Connecticut
        Complaint; sustained in Connecticut Order]............................ 50

    D.  March 4, 2008 Statements [Misrep. J in Connecticut Complaint;
        sustained in Connecticut Order]............................................ 51

E.     April 17, 2008 Statements [Misrep. K in Connecticut Complaint; sustained in Connecticut Order]......................................................... 52

F.     December 17, 2008 Statements [Misrep. L in Connecticut Complaint; sustained in Connecticut Order]............................................ 52

G.     February 24, 2009 Statements [Misrep. M in Connecticut Complaint; sustained in Connecticut Order]............................................ 53

H.     March 4, 2009 Statements [Misrep. N in Connecticut Complaint; sustained in Connecticut Order]......................................................... 55

I.      March 10, 2009 Statements [Misrep. O in Connecticut Complaint; sustained in Connecticut Order]......................................................... 57

J.      April 16, 2009 Statements [Misrep. P in Connecticut Complaint; sustained in Connecticut Order]......................................................... 59

K.     June 30, 2009 Statements [Misrep. Q in Connecticut Complaint; sustained in Connecticut Order]......................................................... 60

L.     February 26, 2010 Statements [Misrep. S in Connecticut Complaint; sustained in Connecticut Order]............................................ 61

M.     March 5, 2010 Statements [Misrep. T in Connecticut Complaint; sustained in Connecticut Order]......................................................... 62

N.     March 23, 2010 Statements [Misrep. V in Connecticut Complaint; sustained in Connecticut Order]......................................................... 63

O.     April 15, 2010 Sustainability Review Statements [Misrep. W in Connecticut Complaint; sustained in Connecticut Order] ................................... 64

P.     April 24, 2010 Statements [Not pled in Connecticut Complaint]........................ 65

VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 66

A.     The Orange Book Reports Disclosed Process Safety Related Information to GORC and SEEAC Members and Board Members .................... 66

B.     The Defendants Consciously Limited the Applicability and Scope of the S&O Audit Function so as to Exclude BP's Gulf of Mexico Deepwater Wells ............................................................................................ 66

C.     Defendants Failed to Disclose and Address Process Safety and Operational Risk Issues.......................................................................... 67

D.     Defendants Were Aware of or Recklessly Disregarded Heightened Process Safety Risks and Deficiencies With Third-Party Rigs ........................... 67

E. BP Received Numerous Safety Warnings for Deficiencies in the Company's North Sea Operations ........................................................ 68

F. BP Retaliated Against Workers Who Raised Safety Concerns ........................... 69

G. Defendants Falsely Assured Investors That BP Was Implementing The Baker Report's Recommendations ................................................. 70

H. Defendants' Public Estimates Of Oil Spilling Into The Gulf Are Contradicted By Cotemporaneous Internal BP Documents................................. 73

I. The DOJ Has Charged Former BP Engineers for Deleting Text Messages About the Amount of Oil Spewing Into the Gulf, and is Investigating Whether BP Representatives Lied to Congress About the Extent of the Spill .............................................................. 74

J. BP Exploration & Production Inc. Has Pled Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress .................. 76

K. BP Has Agreed to Pay $525 Million to Settle the SEC's Charges That the Company Misled Investors Regarding the Oil Spill Flow-Rate ................................................................................... 78

L. Defendants Were Motivated to Conceal the Amount of Oil Spewing Into the Gulf to Reduce Fines and Penalties by Billions of Dollars..................................................................... 78

VII. LOSS CAUSATION/ECONOMIC LOSS ....................................................... 79

VIII. RELIANCE.............................................................................. 86

IX. NO SAFE HARBOR ...................................................................... 89

X. MARYLAND SRPS'S CLAIMS ARE TIMELY .......................................... 89

XI. CLAIMS FOR RELIEF .................................................................. 90

XII. PRAYER FOR RELIEF ................................................................. 95

Plaintiff Maryland State Retirement and Pension System ("Maryland SRPS"), alleges the following based upon the investigation of its counsel, which includes, among other things, a review of Defendants'[1] public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, Defendants' filings and statements to government regulators including, *inter alia*, the U.S. Minerals Management Service ("MMS"), wire and press releases published by and regarding BP p.l.c. ("BP" or the "Company"), pleadings and filings in *In re BP p.l.c. Securities Litigation*, No. 10-md-02185 (S.D. Tex.), the Court's Order denying in part Defendants' motion to dismiss claims in *In re BP p.l.c. Securities Litigation*, No. 10-md-2185, 843 F. Supp. 2d 712 (S.D. Tex. 2012) ("*BP I*"), the Court's subsequent Order denying in part Defendant's motion to dismiss claims in *In re BP p.l.c. Securities Litigation*, No. 10-md-2185, 922 F. Supp. 2d 600 (S.D. Tex. 2013), pleadings and filings in the oil spill litigation, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, MDL 2179 (E.D. La.), pleadings and filings in *Connecticut Retirement Plans and Trust Funds et al. v. BP PLC, et al.*, No. 12-cv-1256, the Charge of Information and Guilty Plea Agreement filed by the Department of Justice ("DOJ") in *United States v. BP Exploration and Production, Inc.*, No. 2:12-cr-00292-SSV-DEK (E.D. La.) (the "Information and Guilty Plea"), the Indictment filed by the DOJ against David Rainey ("Rainey") in *United States v. Rainey*, No. 2:12-cr-00291-KDE-DEK (E.D. La.) (the "Rainey Indictment"), the Complaint filed in *Securities and Exchange Commission v. BP p.l.c.*, No. 2:12-cv-02774 (E.D. La.) (the "SEC Complaint"), investigations and reports issued in connection with the April 20, 2010 explosion aboard the *Deepwater Horizon* and the subsequent oil spill in the Gulf of Mexico ("Gulf") (*see e.g.,* National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling, Report to the President, "The Gulf Oil Disaster and the Future of Offshore

---

[1]    As defined below.  Unless otherwise noted, all emphases herein are added.

Drilling," Jan. 2011 (the "Presidential Commission"); The Bureau of Ocean Energy Management, Regulation and Enforcement, "Report Regarding The Causes Of The April 20, 2010 Macondo Well Blowout," Sept. 14, 2011 (the "Interior Department Report")) and securities analysts' reports and advisories about the Company.  Maryland SRPS believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.   Maryland SRPS brings this action for damages sustained in connection with its purchases of BP American Depository Shares ("ADSs")[2] and ordinary shares between November 8, 2007 and April 26, 2010, inclusive (the "Relevant Period").  As detailed herein, Maryland SRPS suffered significant losses when events following the April 20, 2010 explosion aboard the *Deepwater Horizon* semi-submersible rig and the subsequent historic oil spill from the Macondo Prospect ("Macondo"), revealed that certain prior statements by Defendants were materially false and misleading when made, including but not limited to statements regarding BP's purported implementation of specific process safety protocols recommended by an independent panel due to numerous accidents, the progress of BP's implementation of the Operating Management System ("OMS") as well as the scope of the OMS, BP's ability to respond to oil spills in the Gulf and BP's post-spill estimates of the oil flow rate following the *Deepwater Horizon* incident.[3]

---

[2]    As used herein, ADSs also includes any BP securities designated as "American Depositary Receipts."

[3]    For ease of reference, Maryland SRPS has indicated which alleged misstatements were previously pled in *Connecticut Retirement Plans and Trust Funds et al. v. BP, PLC et. al.,* No. 12-cv-01272 (the "*Connecticut* Complaint") and *Alameda County Employees' Retirement Association et al. v. BP, PLC et. al.*, No. 12-cv-01256 (the "*Alameda* Complaint"), and sustained in the Court's December 5, 2013 orders on Defendants' motions to dismiss in these two actions.  *See In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6383968 (S.D. Tex. Dec. 5, 2013) (the "*Alameda* Order"); *In re BP p.l.c. Sec. Litig.*, No. 10-MD-2185, 2013 WL 6383025 (S.D. Tex. Dec. 5, 2013) (the "*Connecticut* Order").  Maryland SRPS has also attached a table as Appendix A setting forth this information.

2.     The April 20, 2010 disaster led to the tragic loss of eleven lives, and BP's inability to cap millions of barrels of oil leaking into the Gulf for nearly three months resulted in the largest recorded offshore oil spill in history.  While it is difficult to compare the loss of life and the devastating impact on the environment to a purely economic injury, the resulting financial injury suffered by BP investors was nonetheless enormous and is compensable under applicable laws.

3.     BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heating and lighting, retail services and petrochemicals products.  Among other things, the Company engages in deepwater drilling for hydrocarbons around the globe.

4.     BP's dominance in the global energy market aside, the Company had a history of catastrophic disasters resulting in deaths and environmental crimes leading into the Relevant Period.  These incidents, which included the Prudhoe Bay, Alaska and Texas City, Texas disasters, among others described herein, led the Company to retain former Secretary of State James A. Baker to lead an independent panel (the "Baker Panel") to review and improve the Company's safety procedures and to identify root causes of the Texas City disaster.  The Baker Panel's investigation resulted in a 350 plus page report – the "Baker Report"— which cited organizational problems as the root cause of BP being plagued by major incidents and repeated safety lapses.

5.     As noted by the Presidential Commission, the Baker Report concluded, among other things, that "BP management had not distinguished between occupational safety . . . and *process safety*" and "ha[d] not adequately established process safety as a core value."  Whereas process safety seeks to implement protocols in order to avoid large scale disasters (such as a

deadly explosion), occupational safety seeks to limit injuries to BP personnel (reducing slips and falls). As the Presidential Commission further noted, "[t]hese incidents and subsequent analyses indicate that the company does not have consistent and reliable risk management processes – and thus has been unable to meet its professed commitment to safety."

6.     The Baker Report also included specific recommendations for BP to implement to improve process safety. The Baker Report was publicly released by Defendants on January 16, 2007, and was accompanied by statements from BP executives assuring investors that the recommendations set forth in the Baker Report would be (and were already being) implemented by the Company.

7.     Following the release of the Baker Report, the Company's public statements routinely detailed specific steps taken by BP to purportedly reform its risk profile while reducing the possibility that lapses leading to the pre-Relevant Period disasters would be repeated. For example, in connection with the release of the Baker Report, John Browne, BP's then Chief Executive Officer ("CEO"), stated that "*BP gets it, and I get it too*,' . . . 'I recognize the need for improvement.'" Defendant Anthony B. Hayward ("Hayward"), who was at the time in the process of taking over for Browne as BP's CEO, assured investors (in February 2007) about his commitment to *focus "like a laser" on safety*. Subsequent assurances by BP reaffirmed the Company's commitment to implement the recommendations in the Baker Report.

8.     In response to the Baker Report, BP also pledged to implement the Operating Management System ("OMS"). BP touted OMS as an integrated and comprehensive system for identifying, reducing and managing process safety risks. BP further represented that OMS would apply across all of BP's operations.

9.     Against the backdrop of process safety reforms purportedly being guided by the recommendations in the Baker Report, BP was increasing its presence in the Gulf and holding out its potential to extract hydrocarbons from the Gulf as highly material to its operations and future prospects.   The Company's regulatory filings also assured investors that BP was fully prepared to address the risks associated with its Gulf operations.   For example, the Company's oil spill response plan ("OSRP") for the Gulf proclaims that the "worst case discharge" from an exploratory well from offshore drilling is expected to be *250,000 barrels* of crude oil per day. *See* BP Regional Oil Spill Response Plan – Gulf of Mexico, Appx. H at p. 30 ("Regional OSRP").[4]   The Company's Initial Exploration Plan for Mississippi Canyon Block 252 (marked received by the MMS on Feb. 23, 2009) ("Macondo IEP") also assured investors that "worst case" scenarios were contemplated by BP and that the Company was capable of responding to a worst case event.   Defendants' misstatements assured investors that BP could experience significant growth while controlling risks.

10.     On the night of April 20, 2010, Defendants' false assurances about BP's progress in implementing the recommendations of the Baker Report and BP's ability to respond to a major oil spill, were exposed as being materially false and misleading when made, when an eruption of oil or natural gas occurred at the Company's Macondo site about 50 miles off the Louisiana coast leading to an intense fire aboard the *Deepwater Horizon*.

11.     The fire eventually consumed the rig, caused the tragic loss of eleven lives and ultimately caused the rig to sink.   As the *Deepwater Horizon* sank, it pulled a pipe connecting the rig to the well (the "riser") with it.   The riser subsequently tore away from the well.

---

[4]     The OSRP is available at:
http://housedocs.house.gov/energycommerce/Docs_06152010/BP.Oil.Spill.Response.Plan.pdf.

Crewmembers' efforts to trigger *Deepwater Horizon*'s blow out preventer ("BOP"), a device used to seal a well in an emergency, failed.

12.     The failure of the BOP resulted in oil spilling into the Gulf.  Rather than respond to the disaster with a definitive plan to contain the spill, as Defendants had publicly represented BP had put in place, Defendants employed a trial and error approach with various tactics that were developed as the spill was raging.  Defendants' efforts included very high profile failures including "top hat," "top kill," and "junk shot."   BP's inability to contain the spill within a reasonable period of time established that Defendants' statements regarding BP's spill response plan were materially false and misleading.  BP was operating in the Gulf throughout the Relevant Period without any such definitive plan.

13.     By late June 2010, oil had contaminated the coastlines of Louisiana, Alabama, Mississippi, and Florida, and the well had yet to be capped.  By this time, approximately 36% of the Gulf's fishing area was closed because of the spill.  The amount of oil spewing into the Gulf (approximately 60,000 barrels per day) established that – despite the representations made in BP's MMS filings – the Company had no ability to handle a fraction of the "worst case" estimates provided in its regulatory filings.

14.     Separate from BP's inability to contain the oil spill, BP's officers including, Defendants Hayward, BP's then CEO, and Douglas J. Suttles ("Suttles"), the head of BP's spill response team, minimized the impact of the disaster by providing the market with materially false and misleading spill figures that were expressly contradicted by contemporaneous internal BP reports that showed higher amounts of oil were spewing into the Gulf than BP's officers had claimed.

15.     All told, it BP took nearly three full months after the explosion on April 20, 2010 to suspend the flow of oil and ultimately to seal the leak with a relief well.  The well was finally capped on July 16, 2010, eighty-seven days after oil began spewing into the Gulf from the Macondo site.  A relief well permanently sealed the well several days later.

16.     The Gulf spill has eclipsed the Exxon Valdez oil spill in Prince William Sound, Alaska, on March 24, 1989, to become the worst environmental disaster in the history of the United States.

17.     Throughout the Relevant Period, Defendants violated the federal securities laws and English common law by issuing materially false and misleading statements while possessing the required state of mind for each particular claim.  In this respect, Defendants either knew or recklessly disregarded that they were making false and misleading statements.

18.     The Company's investors have suffered massive losses from the materialization of the risks concealed by Defendants' misstatements and omissions.  At the time of the explosion aboard the *Deepwater Horizon*, BP ADSs traded for approximately $60.00 per share and its ordinary shares traded for 655.4 pence per share.  After the explosion and BP's inability to respond adequately to the oil spilling into the Gulf, the Company's ADSs and ordinary shares fell significantly, eliminating approximately $91 billion in the Company's total market capitalization value (through June 2010).  Maryland SRPS's losses are a direct result of Defendants' misconduct as set forth herein.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under the common law of England.

20.     This Court has federal question jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.  This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Maryland SRPS and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Maryland SRPS's English law claims.

21.     This Court has personal jurisdiction over each of the Defendants named herein. As set forth in further detail below, each of the Defendants either maintained a principal place of business in this District, conducted a sufficient amount of business in this District, issued the alleged false and misleading statements from within this District, resides within this District, and/or otherwise has sufficient minimum contacts with this District or the United States to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Among other facts, personal jurisdiction is demonstrated by the following:

(a)     BP p.l.c.'s North American and Exploration headquarters are located in this District, in Houston, Texas, and it regularly transacts business in this District, including through its U.S. subsidiaries, BP America, Inc. ("BP America") and BP Exploration & Production, Inc. ("BP Exploration"), whose principal places of business are also in Houston, Texas.  In addition, BP p.l.c. and its officers issued materially false and misleading statements from Houston, Texas during the Relevant Period.  BP p.l.c. also derives a substantial amount of revenue from within Texas, including from BP gas stations.  BP p.l.c.'s agent in the United States is BP America Inc., which is located in this District at 501 Westlake Park Boulevard, Houston, Texas 77079.

(b)     BP America's principal place of business is in this District, at 501 Westlake Park Boulevard, Houston, Texas 77079.  BP America produces oil and natural gas products in the United States and conducts a substantial amount of its business in this District, including through its wholly-owned subsidiary, BP Exploration.  Throughout the Relevant Period, BP America controlled Defendant BP Exploration and that entity's issuance of material information to the public.

(c)     BP Exploration has its principal place of business in this District, at 200 Westlake Park Boulevard, Suite 1900, Houston, Texas 77079.  BP Exploration engages in oil exploration and production activities and conducts a substantial amount of business in this District.   In addition, BP Exploration issued materially false and misleading statements from Houston, Texas during the Relevant Period.

(d)     As BP's CEO, Defendant Hayward conducted a substantial amount of business in this District during the Relevant Period, including operating from Houston, Texas in the aftermath of the *Deepwater Horizon* disaster.   Hayward also issued materially false and misleading statements from Houston, Texas during the Relevant Period.

(e)     Defendant Andrew G. Inglis ("Inglis") also has substantial ties to this District.  From 1997 to 1999 Inglis was responsible for BP's activities in the Gulf before becoming Vice President of BP's U.S. Western Gas business unit and eventually gaining appointment as Executive Vice President and Deputy Chief Executive Officer of BP Exploration, which is headquartered in Houston, in 2004.  Defendant Inglis served as CEO of BP Exploration and as an executive director of the Company from February 2007

until October 2010.  In these capacities, he conducted a substantial amount of business in this District.

(f)      Defendant Suttles resides in this District, in Katy, Texas.  As Chief Operating Officer of BP Exploration, Suttles also conducted a substantial amount of business in this District during the Relevant Period.

22.      Venue is proper in this District pursuant to pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, BP's U.S. operations are headquartered in this District, and its two subsidiaries, Defendants BP America and BP Exploration, maintain their principal office or place of business in Houston.  *See BP I*, 843 F. Supp. 2d at 723 (citing Lead Plaintiff's Consolidated Class Action Complaint); *see also In re BP P.L.C. Sec. Litig*, 2013 WL 6383968, at *2.

23.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications, and the facilities of the national securities markets and exchanges.

## III.   **PARTIES**

### A.   **Plaintiff**

24.      Maryland SRPS is responsible for administering death, disability and retirement benefits on behalf of approximately 380,000 members.  These members include active and former State employees, teachers, police, judges, law enforcement officers, correctional officers, legislators and employees of participating governmental units.  Maryland SRPS's principal offices are located in Baltimore, Maryland.  Maryland SRPS is led in this litigation by the

Attorney General of Maryland, who has authority to bring this suit pursuant to the Maryland Constitution, Art. 5, § 3, the Md. Code. Ann., State Personnel and Pensions Article, §21-107, and Md. Code Ann., State Government Article, § 6-106.   Through its authorized investment managers, Maryland SRPS purchased BP ADSs and ordinary shares during the Relevant Period and suffered losses as a result of the violations set forth herein.

### B.     Defendants and Related Parties

25.     Defendant BP (or BP p.l.c.) is a United Kingdom corporation with its international headquarters located at St James's Square, London SW1Y 4PD, United Kingdom. BP's North American and Exploration headquarters are located in Houston, Texas, at 501 Westlake Park Boulevard, Houston, Texas 77079.   BP's ADSs trade on the New York Stock Exchange ("NYSE") under the ticker "BP."   BP's ordinary shares trade on the London Stock Exchange ("LSE").   On November 15, 2012, BP agreed to pay $525 million to settle charges by the SEC that BP made materially false and misleading statements regarding the amount of oil spilling into the Gulf of Mexico in the aftermath of the *Deepwater Horizon* blowout.

26.     Defendant BP America, a wholly-owned subsidiary of BP Holdings North America Limited, which is in turn 100% wholly-owned by BP, is a Delaware corporation with its principal place of business in Houston, Texas, at 501 Westlake Park Blvd., Houston, TX 77079. BP America produces oil and natural gas products in the United States.

27.     Defendant BP Exploration, a wholly-owned subsidiary of BP America, is a Delaware corporation with its principal place of business in Houston, Texas, at 200 Westlake Park Blvd., Houston, TX 77079.   BP Exploration operates as a subsidiary of BP America.   As set forth herein, BP Exploration's officer issued materially false and misleading statements in MMS filings during the Relevant Period.   Among other things, the Macondo IEP falsely states that "BP Exploration & Production Inc. *has the capability to respond, to the maximum extent practicable,*

*to a worst-case discharge*, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan." On November 15, 2012, BP Exploration pled guilty to felony manslaughter, environmental crimes and obstruction of Congress, and agreed to pay a record $4 billion in criminal fines and penalties for its conduct related to the *Deepwater Horizon* blowout, including its failure to exercise due care with respect to negative pressure tests performed on the Macondo well prior to the accident, and misrepresentations and omissions of oil spill estimates made by Rainey, a senior BP Exploration executive, in connection with the United States House of Representatives Subcommittee on Energy and Environment's investigation into the *Deepwater Horizon* blowout and oil spill.

28.     BP p.l.c., BP America and BP Exploration shall hereinafter be collectively referred to as "BP" or the "Company."

29.     Defendant Hayward became BP's CEO in May 2007 after previously serving as an executive director of BP since 2003. When Hayward assumed the CEO position, he vowed to focus "like a laser" on safety. Beginning in 2006, Hayward chaired the Group Operations Risk Committee ("GORC"), an executive committee that monitored and examined BP's safety protocols, including the Operating Management System ("OMS"), and addressed safety incidents in BP's operations. Hayward also served as executive liaison to the Safety, Ethics and Environment Assurance Committee ("SEEAC"). This committee was charged with examining the processes adopted by executive management to identify and mitigate significant non-financial risks, and obtaining assurance that these processes were appropriate in design and effective in implementation, as well as reviewing BP's internal risk control systems for non-financial risk. SEEAC was responsible for ensuring that BP would implement and adhere to the Baker Panel's recommendations, as well as BP's other safety policies and practices. GORC and

12

SEEAC members received quarterly Health and Safety Environment & Operations Integrity Reports, also called "Orange Book" reports.  These reports monitored the process of the OMS implementation and provided various safety metrics.  During the Relevant Period, Hayward signed BP Annual Reports that contained materially false and misleading information, and he made other materially false and misleading statements as alleged herein.  Hayward made several misstatements from Houston and operated from Houston in the wake of the *Deepwater Horizon* disaster.  On July 27, 2010, BP announced that Hayward would step down as the Company's CEO effective October 1, 2010.  He remained on the BP board until November 20, 2010.

30.     Defendant Suttles served as Chief Operating Officer of BP Exploration from January 2009 until at least January 2011.  As noted by the *Telegraph*, "Suttles was the face of operational briefings during the [Gulf] spill and led the technical response to stopping the oil leak."  Prior to these roles, Suttles had a long-standing career at BP, including serving as President of BP Exploration (Alaska) Inc., from November 2006 through December 2008, and as President of BP Sakhalin (Russia) from June 2005 until November 2006.  During the Relevant Period, Suttles made a materially false and misleading statement as alleged herein.  On January 12, 2011, Suttles announced his retirement from BP.

31.     Defendant Inglis served as CEO of BP Exploration and as an executive director of the Company from February 2007 until October 2010.  Inglis began his career with BP as a mechanical engineer in 1980 and served in various commercial and executive roles at BP, working in the Gulf of Mexico, Alaska and the North Sea.  From 1997 to 1999 Inglis was responsible for BP's activities in the Gulf of Mexico before becoming Vice President of the U.S. Western Gas business unit and eventually gaining appointment as Executive Vice President and Deputy Chief Executive Officer BP Exploration in 2004.  Inglis attended meetings of SEEAC to

report on issues germane to BP Exploration.  Inglis was also a member of GORC and in this capacity he provided reports on BP Exploration to Hayward and received the Orange Book reports, which monitored the progress of the implementation of the OMS across BP's operations. Inglis is a Chartered Mechanical Engineer, a Fellow of the Royal Academy of Engineering and a Fellow of the Institution of Mechanical Engineers.   At the time of the *Deepwater Horizon* incident, Inglis viewed himself as occupying the highest position of authority over BP Exploration's drilling and exploration operations worldwide, except for maybe Hayward:

> Q. Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
>
> A. As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.
>
> * * *
>
> Q. And that, of course, would include Gulf of Mexico, correct?
>
> A. Again, as I said, I was responsible for the – the safety and reliability of—of our operations globally. So that would include the Gulf of Mexico operations.
>
> * * *
>
> Q. All right. And in terms of safety for drilling and exploration operations in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?
>
> A. In terms of the – the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5, 79:18-24, 80:13-22.   On September 29, 2010, BP announced the creation of a new safety division and disclosed that Inglis would step down as a board director on October 31, 2010, and would leave the Company at the end of 2010.

32.     Rainey served as BP America's Vice President of Gulf of Mexico Exploration from April 2005 through June 2010.   Rainey also was BP's representative to the Unified Command, the federal government task force responsible for the overall management of the

*Deepwater Horizon* spill response.  On November 14, 2012, the DOJ indicted Rainey on charges of obstruction of Congress and making false statements during the course of a government investigation.  Among other things, the Rainey Indictment charged Rainey with misrepresenting the accuracy of BP's publicly-reported 5,000 barrel per day oil spill rate while concealing internal estimates, including Rainey's own estimates, which showed the flow rate to be much higher, when responding to inquiries in a May 4, 2010 briefing document and a May 24, 2010 letter to the House Subcommittee on Energy and Environment, which was investigating the *Deepwater Horizon* blowout and resulting oil spill.

33.    Defendants Hayward, Suttles and Inglis are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their high-level positions with BP or BP Exploration, possessed the power and authority to control the contents of BP's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their high-level positions and access to material non-public information, as detailed below, each of the Individual Defendants knew, were reckless in not knowing, that the undisclosed risks had been concealed from the investing public, as further detailed below, and that other affirmative representations regarding BP's safety practices and procedures and post-spill oil flow rates were materially false and misleading when made.

34.    BP, BP America, BP Exploration and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Prior Incidents of Safety Lapses

35.    Prior to the *Deepwater Horizon* explosion and the resulting environmental catastrophe, BP had been at the epicenter of numerous other catastrophic events, including drilling rig blowouts in the Gulf in 2002 and 2003 and in the Nile delta in 2004, as well as a fire and explosion at BP's Texas City refinery and two separate oil spills in the Prudhoe Bay.

36.    In August 2002, the *Ocean King*, a drilling rig in the Gulf of Mexico that was under BP's operational control, suffered a gas blowout that caused an explosion and fire on the rig, resulting in $2 million in damage.  The ensuing investigation by MMS revealed a number of systemic safety issues.  Just three months later, the *Ocean King* suffered a failed cement job, meaning that the cement barrier was not properly installed, thereby allowing hydrocarbons to flow up the wellbore, and the crew was forced to evacuate.  MMS criticized BP for the incident and noted serious deficiencies in the Company's safety protocols.

37.    In May 2003, the Transocean *Discoverer Enterprise*, contracted by BP, was jolted off its drill site near the Macondo well, causing a near blowout.  An inspection of the rig equipment following the accident revealed that the BOP had been partially damaged by the broken riser pipes, highlighting the vulnerability of this crucial fail-safe device.

38.    In August of 2004, BP experienced a blowout on the *GSF Adriatic IV*, a drilling rig leased from Global Santa Fe that was drilling in the Mediterranean Sea, off the coast of Egypt.

39.    On March 23, 2005, a fire and explosion occurred at BP's Texas City refinery in Texas City, Texas, killing 15 workers and injuring more than 170 others.  The disaster led to a series of investigations by government regulators, including the DOJ.

16

40.     In February 2008, BP pleaded guilty to one felony violation of the risk management planning regulations promulgated under the federal Clean Air Act.  In connection with the plea agreement, BP also paid $50 million in criminal fines for the unlawful release of air pollutants during and after the explosion, amounting to the largest fine for such violations at a single facility and was sentenced to three years probation.  In October 2009, the Occupational Safety and Health Administration ("OSHA") issued an $87.4 million civil penalty – the largest in its history – against BP for process safety management violations for failing to correct safety problems at its Texas City refinery.

41.     The investigations following the disaster at Texas City revealed that BP was notified of deteriorating safety conditions at the plant months before the explosion, but did nothing to remedy them.  For example, an October 29, 2006 report on *60 Minutes* revealed "evidence that Texas City's own plant manager, Don Parus, was dismayed by unsafe conditions at the refinery and even tried to get the attention of his bosses in London.  He showed them a report revealing that most workers at the refinery felt the plant was unsafe: one worker wrote 'the equipment is in dangerous condition and this is not taken seriously.'  Another wrote 'this place is set up for a catastrophic failure.'"

42.     Despite the warnings, BP continued cost cutting measures at Texas City.  According to a BP employee interviewed for a 2006 article in *Fortune*, "'The mantra was, Can we cut costs 10%?' he recalls.  At Texas City, even money for painting and external corrosion control was tight—until leaks started appearing.  '*There was an it-can't-happen-here mentality on the part of middle management. . . .*'"

43.     On May 12, 2005, BP released an interim report on the Texas City explosion. The interim report suggested that the disaster was preventable with proper protocols (or proper processes):

> Supervisory staff did not verify that the correct procedure was being used or followed, and were absent from the unit during shift relief, and key stages of the startup.   There was a lack of clarity around who was supervising the startup. Although the startup procedure was not up-to-date, *if the procedure had been followed, or if one of several possible interventions had been made earlier, this incident would not have happened*.

44.     The interim report proposed a number of corrective measures to prevent future accidents.  BP released the final report on December 9, 2005.

45.     Concurrently with the settlement of charges relating to the Texas City explosion (*see* ¶ 39, *supra*), BP settled charges relating to two oil leaks in Alaska.  The leaks occurred in March and August of 2006, and according to the DOJ, "were the result of BP[]'s failure to heed many red flags and warning signs of imminent internal corrosion *that a reasonable operator should have recognized*.  The first pipeline leak, discovered . . . on March 2, 2006, resulted in more than 200,000 gallons of crude oil spreading over the tundra and reaching a nearby frozen lake, where oil spread out onto the ice along one shore.  It was the largest [oil] spill to occur on the North Slope.  The second leak occurred in August of 2006, but was . . . contained after leaking approximately 1,000 gallons of oil.  Nevertheless, the second leak led to the shutdown of Prudhoe Bay oil production on the eastern side of the field."

46.     According to a May 4, 2010 article in *ProPublica* entitled "Congressmen Raised Concerns About BP Safety Before Gulf Oil Spill," congressional hearings following the 2006 Alaskan oil spills accused BP's management of implementing "'*draconian' budget cuts* that affected safety and health, including limiting the use of a corrosion inhibitor inside the pipeline, a step that could have prevented the deterioration that led to the 2006 spill."  An October 31,

2006 article by *Fortune* entitled "Can BP bounce back?" suggested that BP proceeded with budget cuts after being warned in 2002 about a problem with the pipeline.

47.     The DOJ eventually imposed a $20 million fine on BP for the Prudhoe Bay oil spills.   The fine was accompanied by BP's Alaska subsidiary entering into a criminal plea agreement with the DOJ for a misdemeanor violation of the U.S. Federal Water Pollution Control Act.

48.     Ronald J. Tenpas, Acting Assistant Attorney General, stated, "The Texas and Alaska cases illustrate the twin pillars of environmental enforcement: first, protecting human life and health and, second, protecting our natural resources . . . . *BP cut corners with disastrous consequences for both and is being held to account*."

49.     The Texas City and Prudhoe Bay disasters were not unrelated, isolated events. During a Congressional hearing in May 2007, U.S. Chemical Safety and Hazard Investigation Board ("CSB") Chairman Carolyn W. Merritt informed Congressional leaders that she found "'*striking similarities*' between the causes of the fatal BP accident in Texas City, Texas, in 2005, and the company's pipeline failure at Prudhoe Bay, Alaska, in 2006 . . . ." *See* "CSB Chairman Carolyn Merritt Tells House Subcommittee of 'Striking Similarities' in Causes of BP Texas City Tragedy and Prudhoe Bay Pipeline Disaster," CSB (May 16, 2007), available at http://www.csb.gov/newsroom/detail.aspx?nid=190.  According to CSB:

> While the CSB did not investigate the Prudhoe Bay accident, Chairman Merritt was asked by the House Committee on Energy and Commerce Subcommittee on Investigations and Oversight to review a BP internal audit of the accident completed by Booz Allen Hamilton.   Chairman Merritt told the subcommittee, "*Virtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City*."   These included, she said, the "*significant role of budget and production pressures in driving BP's decision-making - and ultimately harming safety*."

50.     Chairman Merritt's comments portrayed common core issues cutting across BP's operations as the source of the Company's safety lapses.

51.     On March 20, 2007, CSB issued its report on the Texas City disaster.  Among other things, the CSB report chided BP for maintaining a culture where employees were discouraged from raising problems with managers.  According to the report, "BP Texas City lacked a reporting and learning culture. Reporting bad news was not encouraged, and often Texas City managers did not effectively investigate incidents or take appropriate corrective action."  The CSB report further detailed efforts by Company officials to cut safety funding by 25% despite three years of mounting safety warnings.  According to a March 20, 2007 article about the CSB report in *Bloomberg*, "'[d]ecisions to cut budgets were made at the highest levels of BP Group despite serious safety deficiencies at Texas City,' the agency said in its final report on the accident's causes.  Cost-cutting 'left the Texas City refinery vulnerable to a catastrophe.'" BP agreed to consider the CSB's recommendations but "*disagree[d] strongly* with parts of the report."

**B.     The Baker Report**

52.     The Texas City disaster led BP to commission the Baker Panel to study the explosion after, as explained in the Company's 2006 Form 20-F (filed with the SEC on March 6, 2007), the CSB "issued an urgent recommendation to BP [in August 2005] to establish an independent panel to assess and make recommendations regarding BP's corporate oversight of safety management systems at its five US refineries and its corporate safety culture."  The ensuing report from the Panel, the Baker Report, was released to investors on January 16, 2007, and included the following general guidelines:

> The Code of Conduct provides a starting point for the conduct expected of BP employees.  All employees must follow the Code of Conduct, and supervisors must also promote, monitor, and enforce compliance with it.  The Code of

Conduct contains a two-page section addressing the health- and safety-related conduct of all BP employees and anyone else working at BP facilities.  It provides that *"[n]o activity is so important that it cannot be done safely"* and emphasizes that "[s]imply obeying safety rules is not enough. BP's commitment to safety means each of us needs to be alert to safety risks as we go about our jobs."

53.     The Baker Report further noted that "[b]ased on its review, the Panel believes that *BP has not provided* effective process safety leadership and *has not adequately established process safety* as a core value across all its five U.S. refineries."  Moreover, as described by the Presidential Commission (defined above), "[The Baker Panel] found that BP management had not distinguished between occupational safety—concern over slips, sprains, and other workplace accidents—and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-change reporting.  And the [P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."

54.     In order to remedy the issues that led to repeated safety violations and culminated in catastrophic events such as the Texas City disaster, the Baker Report provided BP ten specific recommendations to improve the Company's process safety profile and thereby lower its risk profile:

**RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP**

The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals *for process safety*. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the *importance of process safety and matching that message both with the policies they adopt and the actions they take*.

**RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM**

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and *manages process safety risks* at its U.S. refineries.

**RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE**

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of *process safety knowledge and expertise*.

**RECOMMENDATION #4 – PROCESS SAFETY CULTURE**

BP should involve the relevant stakeholders to develop a positive, trusting, and open *process safety culture* within each U.S. refinery.

**RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY**

BP should clearly define expectations and strengthen *accountability for process safety performance* at all levels in executive management and in the refining managerial and supervisory reporting line.

**RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT**

BP should provide more effective and better coordinated **process safety support** for the U.S. refining line organization.

**RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY**

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the *process safety* performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for *process safety* performance for use in the refining and chemical processing industries.

**RECOMMENDATION #8 – PROCESS SAFETY AUDITING**

BP should establish and implement an effective system to *audit process safety* performance at its U.S. refineries.

**RECOMMENDATION #9 – BOARD MONITORING**

BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing *process safety*

performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

**RECOMMENDATION #10 – INDUSTRY LEADER**

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry *leader in process safety management*. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

*See* Baker Report, p. xvi-xvii.

55.     BP accompanied the release of the Report with assurances to investors such as Maryland SRPS that BP was prepared to implement the recommendations set forth by the Baker Panel.  For example, on January 16, 2007 BP issued a press release entitled "BP will Implement Recommendations of Independent Safety Review Panel."   The press release, issued from Houston, stated, in relevant part:

HOUSTON - BP p.l.c. will implement the recommendations made by an independent safety review panel as part of the company's continuing effort to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries.

BP *already has taken a number of actions* which align with the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere.

In a report made public today, the Panel identified material deficiencies in process safety performance at BP's U.S. refineries and called on BP to give process safety the same priority BP has historically given personal safety and environmental performance.  *The Panel made recommendations for improving BP's process safety leadership, systems, expertise and oversight of process safety performance*.

*             *             *

John Browne said: "I want to thank Secretary Baker and the other Panel members for their effort, their insights and their recommendations," Browne said.  "We asked for a candid assessment from this diverse group of experts and they delivered one.  We will use this report to *enhance and continue* the substantial

effort already underway to improve safety culture and process safety management at our facilities."

\*        \*        \*

"Many of the Panel's recommendations are consistent with the findings of our own internal reviews," said Browne. "As a result, we have been *in action on many of their recommendations for a year or more*. Our progress has been encouraging but there is much more to do. Members of our refining leadership team will be meeting with the Panel within the week to address how best to implement these recommendations.

"I share the Panel's confidence in BP's refining workforce," Browne added. "They are, as the Panel stated, ready, willing and able to participate in a sustained effort to move BP towards process safety excellence. As I told the Panel, *I intend to ensure BP becomes an industry leader in process safety management and performance. We will want to do everything possible to prevent another tragedy like the one that occurred at Texas City*."

56.     One of the key purposes of BP's public statements regarding the Company's commitment to implement the recommendations in the Baker Report was to placate investor and regulatory concerns about the Company's slack focus on risk management and safety that led to earlier disasters such as the Texas City Refinery accident and Prudhoe Bay spill.

57.     On February 7, 2007, Hayward, who was at the time transitioning to become BP's CEO, reassured investors that he and BP would remain focused on reforming BP's operations to implement better safety processes. Consistent with the assurances provided by BP with the release of the Baker Report, Hayward told investors that his "priority is simple and clear, it is to implement our strategy by focusing like a laser on safe and reliable operations."

**C.     BP Pledged to Implement OMS and Formed Committees to Enhance and Monitor Process Safety**

58.     BP formed the Group Operations Risk Committee ("GORC") at the end of 2006, with Hayward serving as committee chair, as part of the Company's purported efforts to improve process safety management and to reduce risk. This committee was charged with monitoring and implementing OMS. Echoing the language of the Baker Report's second recommendation,

BP touted OMS as an integrated and comprehensive system for identifying, reducing and managing process safety risks.  The overarching purpose of the committee, which met monthly, was to review and monitor the Company's progress in managing operational risks.   The committee was also charged with keeping Hayward apprised of the Company's progress in these areas.

59.    Defendant Hayward, as BP's CEO and GORC Chairman, was tasked with overseeing the development and implementation OMS. This role, and his attendance at GORC meetings, provided Hayward with unique insight into process safety, as demonstrated by his deposition testimony:

> Q: And you are very familiar with process safety because of your position as Chair of the Group Operations Risk Committee, aren't you?
>
> A: I am.
>
> Q: And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A: That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

60.    Inglis testified that he was also familiar with both the function and implementation of OMS due to his participation in GORC:

> A: The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance.  It was there to act as a vehicle for continuing to improve our performance.  That was through OMS. So part of it was to actually look at how OMS was being implemented.  It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

61.    The Orange Book reports provided regular updates on the status and progress of the OMS implementation to all GORC members, including Inglis and Hayward. As described by

Inglis, this report was intended to provide "performance monitoring information around safety and operational integrity," contained key performance and progress indicators relating to various initiatives and functioned as "a compendium of all the information that you could use to assess the progress of our safety and operation integrity agenda."  Inglis Dep. at 286:24-287:15.

62.    Inglis further stated that he "monitored the implementation of [OMS] through the – the Orange book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]."  Inglis Dep. at 379:11-16.

63.    Hayward also acknowledged that the Orange Book was used to monitor the OMS implementation, stating "if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition."  Hayward Dep. at 791:7-11.

64.    In addition to providing information on the OMS implementation, William Castell, SEEAC Chairman, described the Orange Book as:

> a compilation of Operations and Risk data which is – which is received by [GORC], which is the mechanisms of formal reporting to [GORC] as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated. So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance . . . [and] the – the data in the Orange Book goes down to lost days of work.

Castell Dep. at 377:23-378:12, 381:4-8.

65.    As stated in BP's 2008 Annual Report on SEC Form 20-F, SEEAC's responsibilities included:

- Monitoring and obtaining assurance on behalf of the board that the management or mitigation of significant BP risks of a non−financial nature is appropriately addressed by the group chief executive.

- Reviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic*] recommendations to the board about their adoption and publication.

66.     The Company's Annual Reports further explained that SEEAC "receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young" and "[t]he wider board is kept informed of the activities of the committee, and any issues that have arisen, through the regular update given by the audit committee chair after each meeting."

67.     SEEAC received periodic reports from Hayward, who served as Special Liaison to the committee.  These reports addressed matters overseen by GORC, such as the status of the OMS implementation.   Similarly, Inglis reported to SEEAC on matters pertaining to BP Exploration.  Hayward attended each of the SEEAC meetings in 2008, 2009, and 2010 leading up to the Macondo disaster.

### D.     OMS Scope and Implementation

68.     In response to the Texas City disaster and various other safety incidents, BP pledged to implement OMS company-wide.  The Company claimed that it intended for this system to apply to all BP operations, including the Exploration and Production unit in the Gulf of Mexico. Armstrong Dep. at 57:1-13.  BP and Hayward routinely touted OMS as providing a blueprint for company-wide safe and effective operating procedures.

69.     For example, BP's 2006 Sustainability Report, which was released to the public on May 9, 2007, represented that the "OMS is a comprehensive system that covers *all aspects* of our operations . . ." and that "[t]he new OMS will apply to *all operations*."

70.     During his speech at the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007, Inglis stated: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and *all aspects of operations* throughout BP."

71.     In the "Group chief executive's introduction" of BP's 2007 Sustainability Report, Defendant Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations . . . My executive team continues to monitor closely our safety performance."   The report further stated that GORC met 14 times in 2007.

72.     In the "Group Chief Executive's Review" section of BP's 2008 Annual Review, released on February 24, 2009, Hayward noted that "[t]he BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed.*"   On March 4, 2009, BP released its 2008 Annual Report which was filed on Form 20-F and signed by Hayward.  This report claimed that the OMS was a "*framework for operations across BP* that is integral to improving safety and operating performance in *every site.*"

73.     In its 2008 Form 20-F, BP also stated that "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico."

74.     These statements were false, however, as BP conceded at the oral argument on its initial motion to dismiss in the Class Action.  *See* MTD Hr'g Tr. (Dkt. 304) at 58:15-20 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008 . . . .  This is the one statement, Your Honor, that the plaintiffs have alleged that I admit to the Court is not accurate.").  Despite BP's disclosure of specific statistics and figures detailing the number of sites that had already implemented OMS and demonstrating that the implementation process was

on track, the implementation of OMS in the Gulf of Mexico was not complete in 2008 and still was not complete at the time of the *Deepwater Horizon* disaster in April of 2010.

75. The members of GORC, including Hayward, were kept apprised of the progress of the OMS implementation during the Relevant Period through reports detailing where OMS had been "entrained." As Hayward testified, "I believe I was aware that [OMS] had not been fully implemented [in April of 2010]. It was in the process of being implemented as it was in other parts of BP." Hayward Dep. at 662:25-663:20. Hayward also admitted to knowing that BP did not even begin to implement OMS in the Gulf of Mexico until 2009, stating, "my recollection is that we began the process of cutover to OMS in the Fall of 2009." Hayward Dep. at 789:11-14.

76. William Castel, SEEAC Chairman, similarly testified: "I believe OMS started its integration in the Gulf in 2009. I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [April 2010]." Castell Dep. at 71:11-14.

77. Furthermore, BP never intended for OMS to apply across all of its operations. OMS did not apply to BP operations on rigs that were not fully-owned by BP. BP admitted as much at the oral argument on its motion to dismiss the Class Action. *See* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20. Unbeknownst to the public, some of BP's riskiest well sites were drilled by contracted rigs and were therefore not subject to—and thus not protected by—OMS procedures, including the Transocean-owned *Deepwater Horizon* and five of the other wells located in the Gulf of Mexico. As such, BP's OMS implementation excluded the majority of the Company's operations in the Gulf of Mexico.

78.     Pat O'Bryan, Vice President of Drilling & Completions, testified that the only rig in the Gulf of Mexico covered by the limited implementation of OMS was the *Thunderhorse*. Pat O'Bryan Dep. at 413:6-9.  As stated by John Baxter, Group Head of Engineering for BP and GORC member, OMS did not apply to the *Deepwater Horizon*, rendering the procedures instituted in response to the Baker Panel's recommendations inapplicable to the *Deepwater Horizon* because the rig was not fully-owned by BP.  *See* John Baxter Dep. 175:11-12; 175:14-15; 186:24-187:8; 191:20-192:23; 210:3-10.

79.     Hayward also testified that "no one from BP [is] involved in implementing well control procedures [on a Transocean Drilling Team]" and further stated:

> BP doesn't have well control procedures to manage a [contractor site] well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.  So what we want to verify is that those procedures are in place, and that they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

80.     Members of GORC were well aware of the restricted applicability of OMS.  John Mogford ("Mogford"), former Global Head of Safety & Operations for BP and former member of GORC, confirmed that members of the committee, including Hayward and Inglis, would have known the limitations of OMS because the "OMS document, it was approved and the scope was approved . . . at the GORC."  Mogford Dep. at 150:13-19.  As Mogford stated, GORC discussed "that the scope was that [OMS] applied to BP owned and operated and controlled sites."  *Id*. at 461:23-25.

81.     The utility of OMS was further limited by the lack of access to information on the system provided to BP employees working in the Gulf of Mexico.  The Well Site Leader and Wells Team Leader for the *Deepwater Horizon* testified that they had no formal OMS training

until 2011 and were unfamiliar with the policies that comprised the local OMS for the Gulf of Mexico. *See* John Guide Dep. at 433:5-8; Ronnie Sepulvado Dep. at 357:16-20, 391:6-394:10.

82.     The restricted applicability of OMS and the limited scope of the system's implementation as of April 2010 had profound consequences.  As Hayward admitted, if OMS had been implemented in the Gulf, and had been applicable to the *Deepwater Horizon*, the tragedy that ensued could have potentially been avoided:

> Q: If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>
> ***
>
> A: There is a possible potential—
>
> ***
>
> A: Undoubtedly.

Hayward Dep. at 793:25-794:8.

### E.     BP Experienced Well Blowouts During The Relevant Period As The Result Of Faulty Cementing

83.     Prior to the Relevant Period, BP knew or recklessly disregarded risks associated with the failure of cementing throughout the offshore well development process, from the cementing of well casings into the surrounding seafloor to the plugging of wells during the "temporary well abandonment" phase.

84.     BP was aware, but failed to disclose to the investing public, that as early as 2003, MMS had concluded in a safety alert that cementing failures had contributed to 33 blowout or "well kick" (where oil and gas flows into the wellbore) incidents in the Gulf since 1973 (including 13 since 1995).  MMS had further determined that some of these incidents involved "cratering," "well loss" or "rig and platform destruction by fire."   The MMS safety alert also

noted that "[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico."

85.    Prior to and during the Relevant Period, BP had firsthand knowledge of cementing failures affecting its operations and was aware of similar incidents that had impacted other companies' operations.  BP's experience with cementing failures included a September 17, 2008 gas leak at its Central Azeria platform in the Azeri-Chirag-Guneshi ("ACG") field off the coast of Azerbaijan in the Caspian Sea.  While the incident went undisclosed to the investing public, a U.S. embassy cable released by WikiLeaks, and reported on by *The Guardian* on December 15, 2010, revealed that as a result of "the blowout of a gas-injection well there was 'a lot of mud' on the platform" and 211 platform workers were evacuated.  The diplomatic cable further noted that "[g]iven the explosive potential, BP was quite fortunate to have been able to evacuate everyone safely and to prevent any gas ignition."

86.    As a result of the Central Azeri blowout, BP suspended most of its operations in the ACG field and reduced production from 900,000 barrels per day to approximately 300,000 barrels per day.  A subsequent U.S. embassy cable would reveal that BP "ha[d] closed off a 'few suspect wells' from which they think a bad cement job caused the leaking gas."

87.    BP made no announcement or disclosure of this incident when it occurred in September 2008.  Instead, BP's Form 20-F for 2008 (filed with the SEC on March 4, 2009), only referred to the incident as a "subsurface gas release" and failed to disclose the occurrence of a blowout, the near-avoidance of an explosion aboard the platform, and the possibility that "bad cement jobs" had affected a "few [other] suspect wells."

88.    As reported by *The Guardian*, another U.S. embassy cable noted that "BP had been exceptionally circumspect in disseminating information about the ACG gas leak, both to the

public and to its ACG partners."  Further, the diplomatic cable stated that "some of BP's ACG partners are similarly upset with BP's performance in this episode, as they claim BP has sought to limit information flow about this event."  Undisclosed risks associated with BP's willingness to turn a blind eye to cementing issues plaguing its operations would later materialize in the Gulf during the Relevant Period.

> **F.    The *Deepwater Horizon* Disaster Establishes That "Process" Safety Improvements Were Not Being Implemented**

89.    Against the backdrop of BP's purported company-wide implementation of OMS and other protocols outlined in the Baker Report, BP was simultaneously expanding its operations in the Gulf while touting the region as material to its business success.  In the Company's 2004 annual report (filed with the SEC on June 30, 2005), BP stated, "Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States."  Similar statements were made in each of BP's Forms 20-F filed with the SEC during the Relevant Period.  In addition, the Company's operations in the Gulf have been vital to BP's oil production throughout the Relevant Period, providing approximately 28% of BP's daily oil output (excluding equity-accounted entities) in 2009, up from approximately 16% in 2004.  The Company's 2009 Form 20-F (filed with the SEC on March 5, 2010) declares that "Deepwater Gulf of Mexico is our largest area of growth in the US."

90.    In furtherance of BP's Gulf operations, in March 2008 BP paid approximately $34 million to the MMS for an exclusive lease to drill in Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico where the Macondo well is located.

91.    As explained by the Presidential Commission, "[a]lthough the Mississippi Canyon area has many productive oil fields, BP knew relatively little about the geology of Block 252: Macondo would be its first well on the new lease.  BP planned to drill the well to 20,200 feet,"

understand the geology of the site and to assess whether installing production equipment at the well was warranted.  However, before BP was permitted to drill, federal regulations required BP to file an oil spill response plan with the MMS.  *See* 30 C.F.R. § 254.23.

92.    As noted in *BP I, "*MMS regulations require that [an oil spill response plan] include: (1) an emergency response action plan; (2) disclosure of the equipment available to combat an oil spill; (3) any oil spill response contractual agreements with third-parties; (4) calculations of worst-case discharge scenarios; (5) a plan for dispersant use in case of a spill, (6) an in-situ oil burning plan, and (7) information regarding oil spill response training and drills." 843 F. Supp. 2d at 740 (citation omitted).  The current version of the Company's Regional OSRP for the Gulf was filed on June 30, 2009.  BP's Regional OSRP estimated the "total worst case discharge" scenario for the Gulf of Mexico at a range of between 28,033 barrels of oil per day to *up to 250,000 barrels per day*.

93.    The Regional OSRP also stated that if there was an oil spill in the Gulf, BP (with subcontractors) had the capacity to recover approximately 491,721 barrels of oil per day, significantly higher than the projected total worst case discharge estimate for the Gulf (250,000 barrels per day):

> Offshore response strategies may include attempting to skim utilizing MSRC [Marine Spill Response Corporation] & NRC's [National Response Corporation] Oil Spill Response Vessels (OSRVs), Oil Spill Response Barges (OSRBs), ID Boats, and Quick Strike OSRVs, *which have a combined derated recovery rate of 491,721 barrels/day*.  Temporary storage associated with the identified skimming and temporary storage equipment equals 299,066 barrels.

94.    In addition to the Regional OSRP, BP also submitted the Macondo IEP for the Mississippi Canyon Block 252 to the MMS on March 10, 2009 (the Macondo IEP was dated February 2009 and received by the MMS on February 23, 2009).  The Macondo IEP provided

the following additional estimate of the worst case spill scenario specific to the Mississippi Canyon Block 252:

> Since BP Exploration & Production Inc. *has the capability to respond* to the appropriate worst-case spill scenario included in its regional OSRP . . . *and since the worst-case scenario determined for our Exploration Plan does not replace the appropriate worst-case scenario in our regional OSRP*, I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

95.   BP was required to submit the OSRP and the Macondo IEP to the MMS, a sub-agency of the U.S. Department of the Interior, pursuant to the Oil Pollution Act of 1990, 33 U.S.C. 40 §§ 2701 *et seq.*, and the Facility Response Plan Rules, promulgated thereunder, 40 C.F.R. §§ 112.20, 112.21.   The Oil Pollution Act and the rules promulgated thereunder which require these submissions were enacted largely in response to the Exxon Valdez oil spill to improve the nation's ability to prevent and respond to oil spills by establishing provisions that expand the federal government's ability to respond to oil spills and by establishing new requirements for contingency planning by both the government and the industry.   As these documents were: (i) filed with regulatory authorities pursuant to a federal statutory scheme enacted, in part, to provide transparency to the public regarding BP's ability to respond to oil spill disasters, and (ii) designed to provide reasonable assurances about BP's ability to respond to oil spill disasters, BP had a reasonable expectation that investors and others would rely on the statements set forth in the OSRP and the Macondo IEP regarding the same.

96.   With the Regional OSRP and the Macondo IEP submitted to the MMS, BP began drilling an exploratory well at the Macondo site on October 7, 2009 using the "Marianas" rig. According to the Interior Department Report (defined above), BP moved the *Deepwater Horizon* to the Macondo well after the Marianas sustained damage during Hurricane Ida in November 2009.   The *Deepwater Horizon* crew resumed drilling operations at Macondo in February 2010.

The *Deepwater Horizon* was an ultra-deepwater, dynamically positioned, semi-submersible offshore drilling rig leased by BP.

97.     Once the Macondo well was fully drilled, *Deepwater Horizon*'s instructions were to cap the well and wait for engineers to determine how to extract the oil. *Deepwater Horizon* had drilled 13,000 feet (3,962 meters) below the seafloor at the time of the April 20, 2010 explosion.

98.     The disaster on April 20, 2010 aboard the *Deepwater Horizon* followed the same path as the prior disasters that led BP to engage the Baker Panel. As with the disasters before the Baker Report, the April 20, 2010 disaster was the product of corner-cutting, overlooked and disregarded warnings, a lack of oversight, a failure to train employees properly, and long overdue maintenance.

99.     Specifically, the initial accounts and investigations of the April 20 disaster point to a series of missteps by BP officials leading to hurried and incomplete safety testing before the disaster. On the day of the explosion, *Deepwater Horizon* had been drilling in the Gulf for 43 days longer than scheduled and was approximately $40 million over budget. *See* David Hammer, "BP was more than $40 million over budget for blown-out well, oil spill hearings show," *The Times-Picayune* (Aug. 26, 2010).

100.    According to a May 27, 2010 article in the *Wall Street Journal* entitled "BP Decisions Set Stage for Disaster," "BP made choices over the course of the project that rendered this well more vulnerable to the blowout. . . . Some of BP's choices allowed it to *minimize costly delays*" in a project weeks behind schedule. For example:

- BP cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem, according to documents belonging to, *inter alia*, BP. The test required circulation of mud for six to twelve hours; BP's shortened procedure circulated mud for 30 minutes.

- In an April 18 report to BP, Halliburton warned that if BP didn't use more centering devices, the well would likely have "a SEVERE gas flow problem." Still, BP decided to install fewer of the devices than Halliburton recommended— 6 instead of 21.

- A BP manager overseeing final well tests apparently had scant experience in deep-water drilling. He told investigators he was on the rig to "learn about deep water" drilling.

- When mud was removed from the well and cement was being poured in, BP failed to run tests to determine whether the cement was sealing properly.  Workers from a company able to perform such tests were sent back to land by BP 12 hours before the explosion.

- BP officials argued with the rig's crew about how mud should be removed from the well on the day of the disaster.  BP's view carried the day.  BP has admitted a possible "fundamental mistake" in concluding that it was safe to proceed with mud removal, according to a memo from two Congressmen.

101.    According to the *Wall Street Journal*, on the night of the disaster, *Deepwater Horizon*'s crew, following BP's instructions, began to replace the mud in the well with seawater. Around 9:45 pm, the seawater and remaining mud began shooting out of the derrick.  Workers on the rig attempted to seal the well.  Their efforts came too late.  Gas flowing out from the well found an ignition source and exploded on the rig.

102.    The explosion led to an intense fire ultimately causing the *Deepwater Horizon* to sink 36 hours after the initial blast.  As the *Deepwater Horizon* sank, it pulled a riser connecting the rig to the BOP, causing oil to begin spewing into the Gulf.  Moreover, the BOP – the final protection against a full blown spill – failed.

103.    Rig workers profiled in a *60 Minutes* interview after the explosion stated that the BOP was damaged one month before the spill and that management was on notice of problems. According to one witness, a worker on *Deepwater Horizon* accidently pulled 15 feet of the drill

through the BOP as it was sealed four weeks before the explosion.  The witness reported pulling a "handful of chunks of rubber" from the drill.  Managers dismissed the witness' concerns.[5]

104.    On May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig" based on internal BP documents showing that BP had specific concerns about the well design and the BOP at the Gulf disaster site more than 11 months earlier and that BP officials expressed concerns about a loss of "well control" as late as March 2010.  According to *The New York Times*:

> On June 22 [2009] . . .  BP engineers expressed concerns that the metal casing the company wanted to use might collapse under high pressure.  'This would certainly be a worst-case scenario,' Mark E. Hafle, a senior drilling engineer at BP, warned in an internal report. 'However, I have seen it happen so know it can occur.'  The company went ahead with the casing, but only after getting special permission from BP colleagues because it violated the company's safety policies and design standards.  The internal reports do not explain why the company allowed for an exception.

105.    In March 2010, BP officials, according to *The New York Times*, acknowledged "problems on the rig that included drilling mud falling into the formation, sudden gas releases known as 'kicks' and a pipe falling into the well, BP officials informed federal regulators that they were struggling with a loss of 'well control.'  On at least three occasions, BP records indicate, the blowout preventer was leaking fluid, which the manufacturer of the device has said limits its ability to operate properly."  *The New York Times* analysis of BP documents "show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress" in May 2010.

106.    According to the Presidential Commission, governmental investigations into the causes of the explosion have concluded that "the Macondo blowout was the product of several

---

[5]    "Blowout: The *Deepwater Horizon* Disaster," *60 Minutes* (May 16, 2010).

individual missteps and *oversights by BP* [, among others,] . . .  the cumulative risk that resulted

from these decisions and actions was both *unreasonably large and avoidable*."

107.    BP was itself directly involved in reducing the effectiveness of *Deepwater*

*Horizon*'s BOP.  Specifically, in October 2004 BP requested that one of the two blind ram shears

on *Deepwater Horizon*'s BOP be removed.  A June 20, 2010 report in the *New York Times* stated

that BP's request was made in order to make the BOP more portable.  The risk of having only

one blind shear ram rather than two was significant, especially when used by deepwater rigs,

given that the BOPs in such rigs had a failure rate of 45%.  The blind shear ram is intended to be

a final preventive mechanism if well control is lost.  In the event of well control loss, the blind

shear ram could be engaged to slice through the riser and keep hydrocarbons from leaking

outside of a well.  Thus, BP's decision to utilize the *Deepwater Horizon*, despite knowing that it

had asked to remove one of its shears in order to increase portability, is inconsistent with BP's

post-Baker Report assurances about increasing process safety.  In fact, the October 11, 2004

agreement removing one of the BOP's shears stated that removing the shears would "reduce the

built-in redundancy of the BOP, *thereby potentially increasing [BP's] . . . risk profile*."  BP's

decision to use the *Deepwater Horizon* (and its single shear BOP) to commence the drilling, after

BP knew its request to remove one of the ram shears increased the risk to BP, was inconsistent

with BP's stated commitment to increase process safety as recommended by the Baker Panel.

108.    The circumstances leading to the April 20, 2010 explosion – given the common

root causes between this disaster and the disasters in Texas City and Alaska– establish that the

Baker Report's recommendations that the Company publicly (and repeatedly) assured investors

it was implementing were not in fact being implemented.  Rather, the April 20, 2010 disaster

illustrates the same root causes (cost cutting, ignoring warnings, lack of oversight, improper

training) leading to the pre-Baker Report accidents which were, according to BP, being remedied by implementing the Baker Report's guidelines. Contrary to the Company's public assurances, BP was not implementing the process safety guidelines recommended by the Baker Report, and the April 20, 2010 disaster and follow-on misrepresentations were materializations of the risks that BP concealed.

**G.    BP Has No Legitimate Spill Response Plan, Contrary to Defendants' Representations**

109.    In addition to deficient process safety that ultimately led to the *Deepwater Horizon* explosion, and despite public assurances to the contrary, including those made in its Regional OSRP and well specific response plans (Macondo IEP), BP had no legitimate plan for containing the 250,000 barrels per day in a "worst case" scenario. *See* 30 C.F.R. § 254.23 ("The 'Emergency response action plan' section is the core of the response plan.").

110.    The Regional OSRP and the Macondo IEP grossly misrepresented BP's capabilities to respond to a spill by declaring that "[BP] has the capability to respond to the maximum extent practicable to a worst-case discharge." Other statements in the Macondo IEP further highlight the absence of reasonable safety processes and the overall reckless approach BP undertook considering the risks of the project and the failure to develop an adequate spill response plan for the well. According to the Macondo IEP:

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause *some detrimental effects* to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. *No adverse activities to fisheries are anticipated as a result of the proposed activities.*

111.    Contrary to BP's assurances, the oil spill resulted in the closure of 36% of the fisheries in the Gulf.

112.    With respect to the impact on the shoreline of the United States, the Macondo IEP declares that: "*due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*"   Contrary to BP's assurances, hundreds of miles of coastline were impacted by BP's oil spill and BP was unable (for three months) to offer any legitimate response to address the spill.

113.    The Company's separate spill response plan for the Gulf region – a region touted by BP as its "largest area of growth in the US" – was equally deficient as it, among other things, discussed the impact to walruses from an oil spill in the Gulf.  Large sections of the OSRP were copied from other sources without any attempt to verify the applicability of the information to the Gulf of Mexico.  As noted by Rep. Ed Markey during congressional hearings after the Gulf oil spill, "walruses . . . have not called the Gulf of Mexico home for 3 million years."  The Regional OSRP, as summarized in a June 9, 2010 article in the *Christian Science Monitor* entitled "BP's gulf oil spill response plan lists the walrus as a local species," contains several other inaccuracies, including:

- Listing Professor Peter Lutz (in BP's 2009 Regional OSRP) as a national wildlife expert when, in fact, Professor Lutz had passed away in 2005.

- Listing the wrong names and phone numbers of several Texas A&M University marine life specialists.

- Listing inaccurate phone numbers for marine mammal stranding network offices in Louisiana and Florida, which are no longer in service.

- "[A]ccording to an Associated Press analysis that details how *BP officials have pretty much been making it up as they go along*.  The lengthy [oil spill response] plans approved by the federal government last year before BP drilled its ill-fated well vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one.  Louisiana Gov. Bobby Jindal, reacting to the AP story, said Wednesday he was angry and frustrated.

'Look, it's obvious to everybody in south Louisiana that they didn't have a plan, they didn't have an adequate plan to deal with this spill,' Jindal said. 'They didn't anticipate the BOP (blowout preventer) failure. They didn't anticipate this much oil hitting our coast. From the very first days, they kept telling us, 'Don't worry, the oil's not going to make it to your coast.''

114. A group of eight U.S. Senators sent a letter to U.S. Attorney General Eric H. Holder, Jr., dated May 17, 2010. In this letter, the Senators asserted that there was no "proven equipment and technology" for responding to a spill and that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis." As BP later acknowledged on May 10, 2010, "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before." Furthermore, as confirmed by Inglis, BP had not previously invested any money in developing methods for containing an oil spill. Inglis Dep. at 162:9-162:21.

115. Without a legitimate spill response plan in place, BP was forced to implement trial and error tactics to suppress the flow of oil into the Gulf.

116. Within hours of the initial explosion onboard the *Deepwater Horizon*, on April 21, 2010, BP initiated efforts to use remotely operated vehicles ("ROVs") to seal off the well. All of BP's attempts failed.

117. BP's initial ROV attempts involved a process known as a "hot stab" to apply hydraulic pressure to a control panel for the blind shear ram. BP's efforts to engage the blind shear ram were futile. Days later, on May 5, 2010, BP would learn that the hot stab method had no probability of success because the control panel was actually attached to a non-operative test ram.

118. BP also employed ROVs to cut electrical wires in the hope that the BOP's "deadman switch" would be triggered and attempted to deploy the ram by activating the well's

autoshear system (an emergency system that automatically seals the well when the riser disconnects from the BOP). These efforts were also unsuccessful.

119. The failed initial efforts to seal the well were followed by additional failures. Among these efforts was the placement of a "cofferdam," or containment dome, over the larger of the well's leaks. The cofferdam was fitted with a pipe that was intended to funnel the leaking oil and gas to the surface where a ship, the Discoverer Enterprise, was waiting to collect the oil and gas. BP anticipated that the cofferdam would collect as much as 85% of the leaking oil.

120. While BP had previously used cofferdams to control oil spills, they had been intended for shallow water operations and had not been tested under deepwater drilling conditions, where extreme pressure and low temperatures present heightened risks. As a result, BP was forced to modify an existing 100-ton concrete and steel cofferdam in order to use it at the Macondo well. By May 5, 2010, BP's modifications had been completed and the cofferdam was en route to the oil spill site from Louisiana.

121. On May 7, 2010, when response crews attempted to lower the cofferdam into place over the leak, gas hydrates (crystal-like substances that form when gas and water are mixed at high pressure and low temperature) began to clog the cofferdam's opening, thereby preventing the crew from properly positioning the cofferdam. As reported by the Presidential Commission, the gas hydrates presented an additional problem for the response crews:

> Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface. Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor. In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."

122.    As further noted by the Presidential Commission, the failure of the cofferdam should not have come as a surprise to BP officials:

> BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."  Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of the hydrates.

123.    Indeed, as noted by former drilling engineer Bob Cavnar ("Cavnar") in his 2010 book entitled "Disaster on the Horizon," the use of a cofferdam was the "silliest contraption" as it "never made much sense" and was "more for show – to look like they were doing something while they were trying to come up with a real plan."  Cavnar would also state in an interview that the cofferdam was "destined to fail" given the "scientific certainty" that gas hydrates would immediately form and clog the cofferdam's opening under deepwater conditions.

124.    As reported by the *New York Times* on May 8, 2010, response crews abandoned the cofferdam on the seafloor next to the leak while, according to Suttles, BP would spend "the next two or three days" deciding how to proceed with efforts to seal the leaks.

125.    BP's next two attempted techniques to halt the flow of oil from the Macondo well, known as "top kill" and "junk shot," involved the pumping of material through the BOP to block the flow of oil and gas from the well.

126.    Specifically, the top kill technique involves pumping heavyweight drilling mud through the BOP and down into the well.  If the density of the drilling mud and the pumping pressure are high enough, the drilling mud will be held in place and will block oil and gas from flowing out through the well.  Similarly, the junk shot technique involves pumping debris like

tire pieces, golf balls, and pieces of rope in an effort to obstruct oil flow through the BOP by filling spaces and gaps in the BOP.

127.   It was intended that together, the top kill and junk shot techniques would complement each other and stop the flow of oil and gas.   However, as reported by the Presidential Commission, these techniques, like BP's cofferdam effort, had never been used in deepwater conditions.   Additionally, top kill and junk shot had not been contemplated by BP's Regional OSRP, presented a significant risk of actually increasing the amount of oil flowing out of the well if the drilling mud further damaged the well, and were unlikely to quickly contain the flow of oil and gas.   Indeed, these two techniques had previously taken approximately 290 days to control the Ixtoc I oil spill that occurred in shallow waters in 1979 when a semi-submersible oil rig exploded and resulted in the release of millions of gallons of oil and gas into the Gulf.

128.   When BP began its top kill and junk shot operations on May 26, 2010, it presented conflicting messages of the likelihood of success. Hayward represented that the Company estimated the chance of success at between 60 and 70 percent while, as noted by the Presidential Commission, "[o]ne MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a 'tiny' chance to succeed."

129.   Over the course of three days, BP proceeded to pump heavy drilling mud at rates in excess of 65 to 70 barrels per minute into the BOP as drilling mud and oil and gas continued to flow back out of the well.   BP also employed numerous "junk shots" to attempt to plug the leak.   Nonetheless, these efforts failed to make progress, and Suttles admitted that "[t]he repeated pumping, we don't believe, will likely achieve success so at this point it's time to move to the next option."

130. According to the Presidential Commission, BP presented the risk of a possible collapse of rupture disks in the well's 16-inch casing as the most likely explanation for the failure of top kill. However, the Presidential Commission noted that it "did not fully accept BP's analysis of what happened" and, instead, attributed the top kill's failure to the fact that BP did not pump heavy drilling mud into the well at a high enough rate because "the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate."

131. Following the failures of the top kill and junk shot efforts, BP again sought the use of a technique not previously discussed in BP's Regional OSRP—the employment of a "top hat" collection device that would funnel oil via a new riser to the Discoverer Enterprise at the surface. As announced on May 29, 2010, in order to install the top hat, BP would use ROVs to cut off the portion of the damaged riser that was still attached to the BOP.

132. Nearly fifty days after the *Deepwater Horizon* explosion, BP had installed the top hat collection device and the *Discoverer Enterprise* was collecting approximately 15,000 barrels of oil per day – just 25% of the amount of oil being released into the Gulf of Mexico.

133. Concurrently, BP successfully implemented an additional method of channeling oil and gas to the surface through the BOP's choke line. Once collected at the surface by a vessel known as the Q4000, oil and gas were burned off. Like the Company's other post-spill efforts, this technique had not been addressed in BP's OSRP filings with the MMS.

134. Given these limited successes, the Presidential Commission reported that BP had been "overly optimistic about the percentage of oil it could remove or collect." Specifically, the Presidential Commission noted that:

> On June 1, Suttles said that he expected the top hat, when connected to the Discoverer Enterprise, to be able to collect the 'vast majority' of the oil. Within

days, it became apparent that the top hat and Discoverer Enterprise were inadequate. On June 6, Hayward told the BBC that, with the Q4000 in place, "we would very much hope to be containing the vast majority of the oil." But when the Q4000 came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

135.    As reported by the Presidential Commission, BP's failure to adequately respond to the oil spill was impacted by BP's refusal to seek assistance:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels. One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the Q4000.

136.    On June 3, 2010, the *Financial Times* published an article entitled "BP 'not prepared' for deep-water spill." In this article, the *Financial Times* reported that Hayward essentially admitted that BP's spill response plans were ineffective. The article stated, in relevant part: "BP did not have all the equipment needed to stop the leak from its Macondo well in the Gulf of Mexico in the aftermath of the explosion on an oil rig six weeks ago, the UK company's chief executive admitted." The article also quotes Hayward admitting that "What is undoubtedly true is that we did not have the tools you would want in your tool-kit. . . ." According to the article, Hayward further accepted it was "an entirely fair criticism" to say the Company had not been fully prepared for a deep-water oil leak.

137.    BP's final attempt to stop the flow of oil and gas from the Macondo well was the installation of a "capping stack" that would be placed on top of the BOP and would function in a similar fashion as a BOP. Like the cofferdam, top kill, junk shot, and top hat efforts, the capping stack plan had not been included in BP's Regional OSRP and had not been previously employed in deepwater spill conditions.

138.    The U.S. Coast Guard and the U.S. government became heavily involved in this process given the Company's prior failures.  As noted by the Presidential Commission:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.  According to one senior government official, before the increased supervision, BP "*hoped for the best, planned for the best, expected the best.*"  [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk. BP, however, was not in the best position to tout that expertise: its well had just blown out.

139.    On July 9, 2010, BP was granted authorization from the U.S. Coast Guard to begin the installation of the capping stack, but was required to wait for additional tests and authorization before closing the capping stack.  After installation of the capping stack was completed on July 12, 2010, experts conducted well integrity testing to assess the likelihood that the well had been damaged and that the closing of the well would force oil and gas through the surrounding seafloor rock formations—resulting in potentially widespread leakage.  On July 15, 2010, BP was granted authorization to begin shutting the valves on the capping stack and began additional well integrity tests to monitor the well.  After 87 days and roughly five million barrels of oil had flowed from the well, BP had successfully stopped the flow of oil and gas into the Gulf.

140.    In the following days, BP sought approval from the U.S. government for a final capping of the well via a "static kill."  The static kill procedure involved pumping heavy drilling mud into the well in a similar procedure to the top kill.  Given that the leakage of oil was well controlled, the static kill procedure required significantly lower pumping pressures than a top kill to seal the well.  After receiving authorization from the U.S. Government on August 2, 2010, BP

completed the static kill procedure and the U.S. Coast Guard reported on August 8, 2010 that the cement seal was holding properly.

141.    The static kill stopped the leaking oil but was only a temporary solution.  In order to shutdown the well, BP needed to drill a second well (a relief well) to intersect the source of the leak and then to plug the primary well with cement.  On September 17, 2010, the first relief well – which BP had begun drilling in May – finally intercepted the Macondo well.   On September 19, 2010, retired Coast Guard Admiral Thad Allen stated that "[t]he Macondo 252 well is effectively dead . . . [w]e can now state, definitively, that the Macondo well poses no continuing threat to the Gulf of Mexico."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS DURING THE RELEVANT PERIOD

### A.    November 8, 2007 Statements [Misrep. G from *Connecticut* Complaint; sustained in *Connecticut* Order]

142.    On November 8, 2007, Hayward spoke at the Houston Forum in Houston, Texas about BP's purported commitment to process safety and about the Company's ability to successfully operate at the industry's "frontiers," which included the Gulf of Mexico.  During his presentation, Defendant Hayward stated, in part:

> *We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.*  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

143.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the fact that at the time BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (*See, e.g.*, ¶¶ 89, 185-86, 187-90).  For example, BP failed to institute procedures to reduce the risk of accidents occurring

at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling (*See, e.g.*, ¶¶ 83-88).  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams (*See, e.g.*, ¶¶ 104-07).  Moreover, the fact that the *Deepwater Horizon* disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP, contrary to its public representation, had not made progress or taken actions to implement the recommendations of the Baker Panel (*See, e.g.*, ¶¶ 98, 108).  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes." (*See* ¶ 5).

### B.    February 22, 2008 Statements [Misrep. H in *Alameda* Complaint; sustained in *Alameda* Order]

144.    On February 22, 2008, BP released its 2007 Annual Review, which contained the following statements by Hayward:

> When I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. *I set out three priorities: safety, people and performance.*

145.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading, for, *inter alia*, the reasons set forth in ¶ 143.

### C.    February 27, 2008 Statements [Misrep. I in *Connecticut* Complaint; sustained in *Connecticut* Order]

146.    On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts.  Hayward stated, in part:

> Notwithstanding this track record, *our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*  Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.

Safe and reliable operations remain our number one priority.

147.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly or with reckless disregard for its truth for the reasons set forth in ¶ 143.   In addition, *inter alia*, as alleged above, Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80).

### D.   March 4, 2008 Statements [Misrep. J in *Connecticut* Complaint; sustained in *Connecticut* Order]

148.   On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, which was signed by Hayward.   In this report, BP stated:

> *Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery*. We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 (see www.bp.com/bakerpanelreport).   *We have made material progress throughout the group across all of the panel's 10 recommendations*.

149.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for its truth, for, *inter alia*, the reasons alleged above in ¶ 143.

### E.    April 17, 2008 Statements [Misrep. K in *Connecticut* Complaint; sustained in *Connecticut* Order]

150.    On April 17, 2008, BP held its Annual General Meeting.   A transcript of that meeting subsequently posted by BP on its publicly-accessible website demonstrated that during the meeting Hayward stated, in part:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance. Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

> Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

> *Our intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*   This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard.

151.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for its truth, for the reasons set forth above in ¶¶ 143, 147.

### F.    December 17, 2008 Statements [Misrep. L in *Connecticut* Complaint; sustained in *Connecticut* Order]

152.    On December 17, 2008, Hayward spoke at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum.   A transcript of Hayward's speech was subsequently posted by BP on its publicly-accessible website.   During the speech, Hayward stated, in part:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.

> These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate.  *We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know*

*what is going on on the ground. And we have continuously reported progress against a response plan and against an independent external report.*

One of the many consequences for us has been to develop and embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat.

153.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for its truth, for the reasons set forth above in ¶ 143.  In addition, *inter alia*, as alleged above, Hayward misrepresented that BP was implementing OMS "right across BP" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80); the fact that the *Deepwater Horizon* disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP, contrary to its public representation, had not made progress or taken actions to implement the recommendations of the Baker Panel (*see, e.g.*, ¶¶ 98, 108); the Presidential Commission found that BP lacked "consistent and reliable risk-management processes." (*see* ¶ 5); an internal document distributed the same month to Hayward warned of "major" process safety concerns that increased the likelihood and severity of "process-safety related incidents." (¶ 186).

### G.    February 24, 2009 Statements [Misrep. M in *Connecticut* Complaint; sustained in *Connecticut* Order]

154.    BP issued its 2008 Annual Review on February 24, 2009.  In the "Group chief executive's review" section of the Annual Review, Hayward echoed the Company's purported commitment to safety, stating:

Q:    At the start of the year what priorities did you set out for BP?

A:  Safety, people and performance, and these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.

Good policies and processes are essential but, ultimately, safety is about how people think and act. That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action. *The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.*

\*\*\*

Q:  How did Exploration and Production perform?

A:  It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream. That, together with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

155.  The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the reasons set forth above in ¶ 143.  In addition, as alleged above, BP misrepresented that BP's Gulf of Mexico operations had transitioned to OMS when, in actuality, OMS had not been implemented in the Gulf as of April 2010 (*see, e.g.*, ¶¶ 74-76); Hayward misled investors by stating that OMS "govern[ed] how every BP project, site, operation and facility is managed" when, in fact, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80); and Hayward had been alerted by an internal document to "major" process safety issues in the Gulf of Mexico which increased the

probability of "process-safety related incidents" and therefore misrepresented that BP's operations in the Gulf of Mexico were covered by the process-safety guidelines in OMS (¶ 186).

> **H.**     **March 4, 2009 Statements [Misrep. N in *Connecticut* Complaint; sustained in *Connecticut* Order]**

156.    On March 4, 2009, BP filed is 2008 Annual Report with the SEC on Form-20F, which was signed by Hayward.  In this Report, BP made numerous false statements regarding the implementation of OMS and the safety and quality of its Gulf of Mexico operations.  BP represented, in part, that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

157.    The Report further stated:

> We continue to implement our new operating management system (OMS)*, a framework for operations across BP that is integral to improving safety and operating performance in every site.*

> When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . .

> The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis. BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability. A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

> All operated businesses plan to transition to OMS by the end of 2010. *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico*, Colombia and the Endicott field in Alaska. . . .

> For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site issues its local OMS

handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

*　　*　　*

Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

158.　The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others: as alleged above, Hayward, who signed the certification for the foregoing statement, had access to information, such as that disclosed in the Orange Book reports, through his positions with SEEAC and GORC, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80); Hayward admitted to knowing that OMS was not fully implemented in the Gulf of Mexico in 2008, that the implementation process would not begin until Fall 2009, and that by April 2010, the Gulf of Mexico had yet to transition to OMS (*see* ¶ 75); Hayward had been alerted by an internal document to "major" process safety issues in the Gulf of Mexico which increased the probability of "process-safety related incidents" and therefore misrepresented that BP's operations in the Gulf of Mexico were covered by the process-safety guidelines in OMS (¶ 186); Hayward knew that OMS was intended to address process safety and prevent major accidents, such as a blowout, and admitted that OMS could have potentially avoided the *Deepwater Horizon* tragedy if implemented in the Gulf of Mexico (*see, e.g.*, ¶¶ 58-60, 82); BP and Hayward also misled

56

investors because the Form 20-F, which Hayward signed, stated that OMS was a "common" system applying a "single operating framework" to "all BP operations" and that the OMS would be "adopted by operating sites" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Defendants further misled investors by failing to disclose that BP lacked adequate safety measures in the Gulf of Mexico, BP did not have a legitimate OSRP, BP had downplayed the risks facing its Gulf of Mexico operations while playing up the potential profitability of the region, and BP failed to put in place adequate internal safety and risk controls (*see, e.g.*, ¶¶ 83-88, 89, 108, 109-14).

I.    **March 10, 2009 Statements [Misrep. O in *Connecticut* Complaint; sustained in *Connecticut* Order]**

159.    On February 23, 2009, BP Exploration submitted to the MMS BP's Macondo IEP for the Mississippi Canyon Block 252.  By March 10, 2009, the Macondo IEP was "deemed submitted" by MMS and was available to the public and BP investors.  The Macondo IEP made the following representations:

> *I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge*, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

> *   *   *

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

> *   *   *

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

160.    The Macondo IEP further stated:

An accidental oil spill from the proposed activities could cause impacts to beaches.  However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*  Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIA/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*

161.    The Macondo IEP also made identical statements to those set forth in the immediately preceding paragraph concerning oil spill response capabilities as they relate to protecting wetlands, costal wildlife, refuges, and wilderness areas.

162.    Further, the Macondo IEP included misleading estimates of a worst-case discharge scenario of 162,000 barrels per day and falsely stated that BP was prepared to respond to such a spill.

163.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because BP proved unable to respond to the oil spill following the *Deepwater Horizon* explosion, despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the *Deepwater Horizon* explosion.  (*See, e.g.*, ¶¶ 109-41).  Moreover, as noted by the Presidential Commission: "Despite [BP's claims that it "could recover nearly 500,000 barrels of oil per day"], the oil-spill removal organizations were quickly outmatched."  Several U.S. Senators commented—and Defendants Hayward and Suttles admitted—that BP did not have "proven equipment and technology" and was instead responding "on an ad hoc basis," "making it up day

to day" despite BP's public pre-spill representations that it had "the capability to respond … to a worst-case discharge."  (*See, e.g.*, ¶¶ 92-95).  In fact, BP had never invested in the development of spill containment methods or technology.  Additionally, BP misrepresented that an oil spill would not adversely impact beaches, wetlands and other environmentally sensitive areas.

164.    With respect to the specific representations related to the Mississippi Cannon Block 252, BP knowing or recklessly represented that the Macondo IEP was based on an analysis of the Mississippi site when, in reality, the Macondo IEP contained boilerplate language simply cut and pasted from one or more exploration plans that MMS had previously approved for other drilling sites.  (*See, e.g.*, ¶ 94).

J.    **April 16, 2009 Statements [Misrep. P in *Connecticut* Complaint; sustained in *Connecticut* Order]**

165.    BP issued its 2008 Sustainability Review on April 16, 2009.  In the "Group chief executive's review" section, Hayward stated:

> You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at each BP site*.  It covers everything from compliance and risk management through to governance and measuring results.

166.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for its truth, for the following reasons, among others: as alleged above, Hayward misrepresented that OMS would be adopted "at each BP site" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80).

### K. June 30, 2009 Statements [Misrep. Q in *Connecticut* Complaint; sustained in *Connecticut* Order]

167. On June 30, 2009, BP publicly filed its revised Regional OSRP for the Gulf of Mexico. The response plan was issued by the Gulf of Mexico Strategic Performance Unit based in Houston, Texas. As set forth therein, the *"TOTAL WORST CASE DISCHARGE" scenarios for the Gulf ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.* With respect to that range, the Regional OSRP stated: (a) an oil spill occurring less than ten miles from the shoreline could create a worse case discharge of 28,033 barrels of oil per day; (b) an oil spill that occurred greater than ten miles from the shoreline could create a worse case discharge of 177,400 barrels of oil per day; and (c) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.

168. The Regional OSRP represented that BP, its subsidiaries and its subcontractors *could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.* BP further claimed in the Regional OSRP that the Company and its subcontractors *"maintain the necessary spill containment and recovery equipment to respond effectively to spills."*

169. The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because BP proved unable to respond to the oil spill following the *Deepwater Horizon* explosion. (*See, e.g.*, ¶¶ 109-41). Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the *Deepwater Horizon* explosion, BP's "oil-spill removal organizations were quickly outmatched." (*See id.*) Several U.S. Senators commented—and Hayward and Suttles admitted—that BP did not have "proven equipment and technology" and was instead responding

"on an ad hoc basis" and was "making it up day to day" despite BP's public pre-spill representations that it had "the capability to respond … to a worst-case discharge." (*See, e.g.*, ¶¶ 92-95, 113-14). With respect to the specific representations in the Regional OSRP, most of the content of the report was at best irrelevant and immaterial, having been copied from other websites, and at worst wholly inaccurate, "describ[ing] biological resources nonexistent in the Gulf" and identifying a "wildlife expert" who had died several years prior to the issuance of the Regional OSRP. (*See, e.g.*, ¶ 113).

### L.   February 26, 2010 Statements [Misrep. S in *Connecticut* Complaint; sustained in *Connecticut* Order]

170.    BP issued its 2009 Annual Review on February 26, 2010. In the section entitled "Safety, reliability, compliance and continuous improvement," BP stated:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), *which provides a common framework for all BP operations*, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework*.

171.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading and was made knowingly, or with reckless disregard for its truth, for the following reasons, among others: as alleged above, BP misrepresented that OMS provided "a common framework for all BP operations" and that OMS enabled "each site" to manage risks in "in accordance with the group-wide framework" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward, Inglis and other GORC members were tasked with monitoring and implementing OMS but nonetheless made the decision to limit the applicability of the Safety & Operation

(S&O) audit function (discussed *infra*) in the Gulf of Mexico (*see, e.g.*, ¶¶ 182-84); Hayward admitted to knowing that OMS was not implemented in the Gulf of Mexico in 2008 and other BP personnel confirmed as much (*see, e.g.*, ¶¶ 75-76).

**M.    March 5, 2010 Statements [Misrep. T in *Connecticut* Complaint; sustained in *Connecticut* Order]**

172.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  BP's Form 20-F stated, in part:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the *BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.*
>
> *           *           *
>
> Our OMS covers all areas from process safety to personal health, to environmental performance.
>
> *           *           *
>
> This performance follows several years of intense focus on training and procedures across BP. *BP's operating management system (OMS), which provides a single operating framework for all BP operations,* is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.
>
> *           *           *
>
> *Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including:* the establishment of a safety & operations (S&O) function with the highest calibre of staff; *development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites*; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

173.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others: BP falsely represented that the

Company intended to implement and was implementing the recommendations of the Baker Panel and other measures to improve process safety after the Texas City refinery incident (*see, e.g.*, ¶¶ 89, 182-84, 187-90); BP misrepresented that OMS provided "a common framework for all BP operations" and that OMS provided "a single framework for all BP operations" when, in actuality, OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); Hayward (who signed the Form 20-F), Inglis and other GORC members were tasked with monitoring and implementing OMS but nonetheless made the decision to limit the applicability of the S&O audit function in the Gulf of Mexico (*see, e.g.*, ¶¶ 182-184); Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67, 80); moreover, the fact that the *Deepwater Horizon* disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in reforming its process safety mechanisms. (*See, e.g.*, ¶¶ 98, 108).

### N.    March 23, 2010 Statements [Misrep. V in *Connecticut* Complaint; sustained in *Connecticut* Order]

174.    On March 23, 2010, Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C.  BP subsequently posted a transcript of Hayward's speech on its publicly available website.  During the speech, Hayward stated the following:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> *That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

175.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless

disregard for the truth, for the following reasons, among others: Hayward falsely represented that the Company intended to implement and was implementing the recommendations of the Baker Panel and other measures to improve process safety after the Texas City refinery incident (*see, e.g.*, ¶¶ 89, 185-186,187-90); and the *Deepwater Horizon* disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP had not "changed in a profound and fundamental way [its] approach to safety." (*See, e.g.*, ¶¶ 98, 108).

      **O.**      **April 15, 2010 Sustainability Review Statements [Misrep. W in *Connecticut* Complaint; sustained in *Connecticut* Order]**

176.    BP issued its 2009 Sustainability Review on April 15, 2010.  The "Chief Executive's Review" section contained a Q&A exchange with Hayward:

Group Chief Executive's Review:

Q:    What progress has BP made on safety during 2009?

A:    Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. *Having been initially introduced at eight sites in 2008*, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. *This means implementation is 80% complete.*

177.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others: as alleged above, Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements (*see, e.g.*, ¶¶ 58-61, 63, 67); Hayward admitted to knowing that OMS was not fully implemented in the Gulf of Mexico in 2008, that the implementation process would not begin until Fall 2009, and that by April 2010, the Gulf of Mexico had yet to transition to OMS—other personnel BP confirmed the

same (*see* ¶¶ 74-76); Hayward had been alerted by an internal document to "major" process safety issues in the Gulf of Mexico which increased the probability of "process-safety related incidents" (*see* ¶ 186); Hayward knew that OMS was intended to address process safety and prevent major accidents, such as a blowout, and admitted that OMS could have potentially avoided the *Deepwater Horizon* tragedy if implemented in the Gulf of Mexico (*see, e.g.*, ¶¶ 58-60, 82); BP omitted to state that OMS only applied to rigs that BP fully-owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon* located in the Gulf of Mexico (*see, e.g.*, ¶¶ 77-79); BP falsely represented that the Company intended to implement and was implementing the recommendations of the Baker Panel and other measures to improve process safety. (*See, e.g.*, ¶¶ 89, 185-86, 187-90).

178.    The explosion aboard the *Deepwater Horizon* occurred just five days later, on April 20, 2010.

**P.    April 24, 2010 Statements [Not pled in *Connecticut* Complaint]**

179.    Following the *Deepwater Horizon* explosion, on April 24, 2010, Defendant Suttles participated in a joint press conference with Coast Guard Rear Admiral Landry as BP's representative from the Unified Command.  During this press conference, Suttles stated that BP had detected ongoing releases of oil from the Macondo well at a rate of approximately 1,000 barrels per day at the seabed.  At this press conference, Suttles also failed to correct Admiral Landry's statement with respect to the Macondo well flow rate that: "It's 1,000 barrels emanating from 5,000 feet below the surface."  In addition, before the press conference, Admiral Landry had asked Suttles if he could support a flow rate estimate of 1,000 barrels per day and Suttles said that he could.

180.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made by Defendant Suttles

knowingly, or with reckless disregard for their truth because the true rate of oil flowing from the well was much higher, as evidenced by the Company's internal estimates.  *See ¶¶* 211-14.  As a senior BP executive and the Company's representative at Unified Command, Suttles knew or was reckless in not knowing these estimates when he told the market on April 24, 2010 that the oil flow was 1,000 barrels of oil per day.

## VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

### A.   The Orange Book Reports Disclosed Process Safety Related Information to GORC and SEEAC Members and Board Members

181.   As discussed above (at ¶¶ 58-61, 65-66), BP used the Orange Book reports to provide information regarding safety and risk information to GORC and SEEAC members and members of the Board of Directors. During the Relevant Period, Hayward was a member of both GORC and SEEAC, and Inglis was a member of GORC and attended meetings of SEEAC to report on issues germane to BP Exploration. The Orange Book was intended to serve as a compilation of safety data from across BP's various units and "had the same level of standing in the firm as financial information." The reports were provided to both GORC and SEEAC on a quarterly basis.  Armstrong Dep. at 86:4-11.

### B.   The Defendants Consciously Limited the Applicability and Scope of the S&O Audit Function so as to Exclude BP's Gulf of Mexico Deepwater Wells

182.   The Safety & Operations ("S&O") segment was a component of OMS that allowed BP's Board to monitor process safety through reporting mechanisms, progress updates and other metrics.

183.   S&O audits tested the compliance of rigs and rig personnel with safety standards and risk management policies, such as those established by OMS.

184.   Despite the intended scope and essential function of the S&O audits, the GORC members, including Hayward and Inglis, opted to limit the applicability of the audits so as to

exclude some of the riskiest aspects of BP's operations.  Areas of BP's operations excluded from the S&O audit function included the majority of BP's deepwater wells in the Gulf of Mexico.  If the S&O audit function had applied to these areas, both SEEAC and GORC would have received data regarding the numerous process safety failures on the *Deepwater Horizon*.  The decision to exclude these areas from the audit program contradicted the Company's professed commitment to the implementation of a systemic framework to improve process safety.

### C. Defendants Failed to Disclose and Address Process Safety and Operational Risk Issues

185.    GORC members, including Inglis and Hayward, received numerous documents detailing myriad process safety risks and deficiencies but failed to disclose and adequately address these issues.

186.    Defendants were also aware of process-safety risks specific to the Gulf of Mexico.  A *Fortune* Magazine article titled "BP: 'An Accident Waiting to Happen,'" which was published on January 24, 2011, revealed that BP executives were previously warned about process safety "gaps" in the Gulf of Mexico. The internal document, which was dated December 2008 and had not been previously released, stated:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

This internal document also called for stronger "major hazard awareness."

### D. Defendants Were Aware of or Recklessly Disregarded Heightened Process Safety Risks and Deficiencies With Third-Party Rigs

187.    Defendants were aware of, or recklessly disregarded, substantial process safety deficiencies and issues with rigs that were owned or operated by third parties, especially those rigs owned and operated by Transocean.

188.    BP experienced a high-potential incident ("HiPo") in the Gulf of Mexico on July 21, 2007 during which Transocean rig operators dragged the BOP along the ocean floor, almost severing underground pipelines.

189.    This incident, in part, resulted in a joint safety improvement plan that would address rig-safety culture and standardization across the two companies when implemented.

190.    In an email sent to the Upstream Senior Leadership Team, dated July 13, 2009, Inglis expressed concerns about Control of Work practices on third party operated rigs, stating:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to clarify the expectations that we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

### E.    BP Received Numerous Safety Warnings for Deficiencies in the Company's North Sea Operations

191.    During the Relevant Period, Defendants were aware of pervasive safety issues across the Company's deepwater drilling operations.  The U.K. Health and Safety Executive ("HSE"), which operates as a national independent watchdog for work-related health, safety and illness, issued at least 100 letters or notices to BP between 2006 and 2010 and levied severe fines against the Company.  These letters, which were not disclosed to the public, cited BP for various safety and environmental violations in connection with the Company's exploration and production rigs, pipelines, and other facilities.  A number of the citations concerned BP's 105 deepwater drilling rigs located in the North Sea and faulted the Company for failing to properly maintain and inspect equipment.

192.    In a February 2, 2007 letter to BP, which was prompted by BP's refusal to dry dock a drilling rig for repairs, the HSE criticized the Company's deficient safety culture. Similarly, in a 2009 letter to BP, the HSE attributed a "Hydrocarbon Release" on BP's

*Schiehallion* rig, located in the North Sea, to the Company's "failure to comply" with its own process safety practices.

### F.     BP Retaliated Against Workers Who Raised Safety Concerns

193.     The CSB's findings that BP maintained a culture where employees were *discouraged* from raising problems with managers, as noted above, persisted during the Relevant Period.

194.     For example, a former BP employee, Kenneth Abbott, filed a lawsuit in federal court seeking to shutdown BP's "Atlantis" platform for operating without properly approved plans.  Atlantis is a deepwater platform operating in the Gulf of Mexico and is responsible for approximately 14% (or 54,000 barrels per day) of BP's deepwater output from the Gulf.  Abbott alleges that BP terminated his employment after he alerted senior managers (in 2008) about Atlantis operating without proper plans.

195.     According to Abbott's lawsuit, "hundreds if not thousands" of documents relating to Atlantis' construction and operation were not approved by regulators, as required.  Abbott claims that "BP management . . . recognized the gravity of this problem" because "using the incomplete, unapproved drawings, 'could lead to catastrophic Operator errors due to their assuming that the drawing is correct.  Turning over incomplete drawing to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard[,] and *Process Safety Regulations.*'"

196.     As noted in a May 17, 2010 article in *ProPublica,* Abbott alleges that BP willfully ignored his warnings "and instead emphasized saving money."  Congress ordered the MMS to investigate Mr. Abbott's allegations.

197.     Separately, "[a]n independent firm hired by BP wrote in an April [13, 2010] letter that it had substantiated" Abbott's allegations.  *See* Juliet Eilperin, "Substantial safety concerns

raised about the Atlantis, another BP oil rig," *Washington Post* (May 15, 2010).  Billie Pirner Garde, a deputy ombudsman, wrote to Abbott and stated: "The concerns that you expressed regarding the status of the drawings upgrade project were not unique to you . . . It was a challenge to the Project and of concern to others who raised the concern before you worked there, while you were there and after you left."  *Id.*

198.   BP's wrongful retaliation against workers who raised safety concerns evidences Defendants' knowledge of such concerns and their intent to mislead the public regarding the true state of the Company's attention and commitment to drilling safety.

### G.   Defendants Falsely Assured Investors That BP Was Implementing The Baker Report's Recommendations

199.   Throughout the Relevant Period, Defendants were aware or recklessly disregarded that their statements regarding BP's implementation of process safety improvements, including OMS, were untrue and that they omitted material information concerning BP's failure to make adequate progress toward satisfying the recommendations set forth in the Baker Report and to implement OMS across all of BP's operations.   Indeed, Hayward's self-proclaimed personal involvement in the Company's prioritization of safety since the beginning of his tenure as CEO establishes that he knew, or was reckless in not knowing, that BP was failing to implement the recommendations in the Baker Report.

200.   Hayward's succession as BP's CEO in May 2007 was touted as an opportunity for BP to make significant progress toward improving process safety within the Company's operations.  In fact, following the release of the Baker Report in January 2007, BP held a press conference on January 16, 2007 to discuss the Baker Report's recommendations.  During the press conference, Browne assured investors that:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too.  This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred.   I recognise the need for improvement and that my successor, *Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.*

*   *   *

The list of what we have done since the accident *shows how seriously we take process safety*.

201.    Upon assuming the role of Company CEO in May 2007, Hayward vowed to focus "like a laser" on safety.  To this end, Hayward and the Company repeatedly assured investors, through BP's statements and public filings with the SEC, that BP was committed to improving process safety within the Company's operations, including the critically important oil operations in the Gulf.

202.    Indeed, after his first year as the Company's CEO, Hayward assured investors that when he took over as CEO, "the immediate task was to restore the integrity and the efficiency of BP's operations" and that he "set out three priorities: safety, people and performance."

203.    Hayward's involvement in improving companywide process safety included chairing BP's GORC and serving as executive liaison to the SEEAC.  SEEAC was ultimately responsible for ensuring that BP's safety protocols were implemented and complied with.  GORC was responsible for reviewing and analyzing safety incidents involving BP's operations and reported to SEEAC.

204.    Separately, Hayward implemented a safety course for BP executives known as the BP "Operations Academy."   The Operations Academy, which Hayward himself attended, consisted of three two-week sessions at Massachusetts Institute of Technology in which BP executives focused on process safety.  As explained in a January 24, 2011 *Fortune* article entitled "BP: An Accident Waiting to Happen," the course taught universal process-safety

lessons including that: "Critical procedures should be formalized and carried out with rigor; it's essential to maintain multiple safeguards against an accident; it is dangerous to change operating plans on the fly; anomalies need to be clearly resolved; small incidents are warning signs that conditions are ripe for a disaster."

205.    Another critical component of Hayward's plans for improving process safety was the implementation of BP's OMS which was touted as having "an increased focus on process safety and continuous improvement."   Indeed, in a speech delivered at the Company's 2008 Annual General Meeting, Hayward stated that the OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

206.    Hayward's plans to improve process safety also included the reorganization of the Company to achieve "increased efficiencies."   According to Byron Grote, BP's Chief Financial Officer, the reorganization efforts were "designed to simplify the organization and improve productivity and accountability, freeing up operating units to enable them to focus on safe, reliable, and profitable operations."

207.    While touting his commitment to improving process safety, Hayward knew that drilling the Gulf of Mexico was inherently risky and that a deepwater blowout was one of the largest risks confronting BP's Gulf operations.  As he stated during his deposition, "[a deepwater blowout] was certainly one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit."  Hayward Dep. at 196:10-18.

208.    In the aftermath of the Macondo spill, Hayward effectively admitted that the implementation of process safety improvements during the Relevant Period had failed.  As

discussed above, Hayward stated during this deposition that if OMS had been implemented in the Gulf of Mexico, the *Deepwater Horizon* tragedy could have potentially been avoided. (¶ 82). On May 3, 2010, Hayward acknowledged that BP was fully responsible for the spill and stated that "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . . We will absolutely be paying for the cleanup operation. There is no doubt about that. It's our responsibility – we accept it fully."

209. Similarly, in a June 2, 2010 article entitled "BP 'not prepared' for deep-water spill," the *Financial Times* reported that Hayward "accepted it was 'an entirely fair criticism' to say the company had not been fully prepared for a deep-water oil leak" and acknowledged that it "is undoubtedly true is that we did not have the tools you would want in your tool-kit."

210. Then, in a November 9, 2010 interview with *BBC*, Hayward confessed that BP had failed to develop adequate emergency response plans for oil spills and admitted that the Company was "*making it up day to day*."

### H. Defendants' Public Estimates Of Oil Spilling Into The Gulf Are Contradicted By Cotemporaneous Internal BP Documents

211. Throughout the Relevant Period, Defendants were aware or recklessly disregarded that their statements regarding estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were false and/or omitted material information concerning the true magnitude of the Macondo well oil spill. Specifically, Defendants' public statements were directly contradicted by internal reports which estimated the oil spill rate far in excess of the range of 1,000 to 5,000 barrels per day that Defendants reiterated publicly for weeks following the explosion.

212. For example, according to the SEC Complaint and/or the Rainey Indictment:

a)    by April 22, 2010, a BP engineer estimated the oil spill rate to be between 64,000 and 146,000 barrels per day based on different oil flow paths within the well.  Rainey received this estimate on or about this date; and

b)    on or before April 24, 2010, BP was aware of an estimate that showed the oil spill rate to be approximately 100,000 barrels per day.

213.    As Chief Operating Officer for BP Exploration and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Defendant Suttles knew or recklessly disregarded the Company's internal estimates of the spill rate from the Macondo well.

214.    In November 2010, Hayward confirmed that BP was "making it up day to day" following the *Deepwater Horizon* spill and had failed to draw up sufficient emergency plans. Further, with respect to the post-spill estimates, Hayward later acknowledged, about a month after he provided public estimates, that the volume of oil spilling into the Gulf was far greater than BP's initial statements indicated."  *See BP I*, 843 F. Supp. 2d at 786-88 (crediting the class action plaintiffs' allegations that Suttles possessed internal reports undermining his public statements regarding BP's flow rate estimates after the spill).

**I.    The DOJ Has Charged Former BP Engineers for Deleting Text Messages About the Amount of Oil Spewing Into the Gulf, and is Investigating Whether BP Representatives Lied to Congress About the Extent of the Spill**

215.    Defendants' scienter is also demonstrated by evidence unearthed as a result of the United States Department of Justice's investigation into whether BP representatives lied to Congress about the amount of oil spewing into the Gulf.  On April 23, 2012, federal prosecutors filed criminal charges against BP engineer Kurt Mix for obstruction of justice.  According to a DOJ press release, "Mix worked on internal BP efforts to estimate the amount of oil leaking from the well and was involved in various efforts to stop the leak.  Those efforts included, among others, Top Kill. . . ."  The DOJ press release further states that Mix:

deleted on his iPhone a text string containing more than 200 text messages with a BP supervisor. The deleted texts, some of which were recovered forensically, included sensitive internal BP information collected in real-time as the Top Kill operation was occurring, which indicated that Top Kill was failing. . . . .Mix deleted a text he had sent on the evening of May 26, 2010, at the end of the first day of Top Kill. In the text, Mix stated, among other things, "Too much flowrate – over 15,000." Before Top Kill commenced, Mix and other engineers had concluded internally that Top Kill was unlikely to succeed if the flow rate was greater than 15,000 barrels of oil per day (BOPD). At the time, BP's public estimate of the flow rate was 5,000 BOPD – three times lower than the minimum flow rate indicated in Mix's text."

. . . . Mix [also] deleted a text string containing more than 100 text messages with a BP contractor with whom Mix had worked on various issues concerning how much oil was flowing from the Macondo well after the blowout.

*See* April 24, 2012 Department of Justice Press Release, "Former BP Engineer Arrested for Obstruction of Justice in Connection with the *Deepwater Horizon* Criminal Investigation: First Criminal Charges to Result from the *Deepwater Horizon* Task Force Investigation."

216.    On December 18, 2013, a federal jury in New Orleans found Kurt Mix guilty of one count of obstruction of justice for deleting messages during a federal investigation into how much oil leaked after the *Deepwater Horizon* explosion. According to the *New York Times*, The jury "decid[ed] that Mr. Mix intended to destroy evidence when he deleted voice and text communications between himself and a supervisor and a BP contractor." *See* December 18, 2013, *New York Times* article, "Ex-BP Worker Is Found Guilty of Obstruction in Gulf Spill."

217.    According to the *Wall Street Journal*, a May 27, 2010 e-mail from senior BP engineer Rupen Doshi to BP workers and two other firms working to stop the leak also stated, "NO ONE is to get the data files from the Top Kill method that is being pumped from yesterday or today except for Paul Toom's group." Paul Tooms was then head of upstream engineering at BP. The *Wall Street Journal* further reported that in an e-mail sent later that day, Tooms stated, "The purpose of the note was meant to put a limit on the people outside the circle of trust getting the data."

### J.    BP Exploration & Production Inc. Has Pled Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress

218.    On November 15, 2012, BP Exploration agreed to plead guilty to eleven counts for violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count for a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one count for a violation of 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3) (Clean Water Act), and one count for a violation of 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), and to pay a record $4 billion in criminal fines and penalties for the Company's conduct leading to the *Deepwater Horizon* accident that killed 11 people.   Among other things, the Information and Guilty Plea charging BP details that the Company, through Rainey, obstructed a Congressional inquiry into the amount of oil spilling into the Gulf following the accident.   Further, as part of its guilty plea agreement, BP Exploration admitted the following facts:

> On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:
>
> 1. BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.
>
> 2. BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.
>
> 3. BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.   At the time that this false representation was made, BP's former vice president knew that those estimates were the

product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.  BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6.  On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

219.  BP further admitted that its "former vice president's [i.e., Rainey's] knowledge and actions are attributable to BP."

220.  Also on November 15, 2012, the DOJ unsealed the Rainey Indictment filed the previous day, charging Rainey with one count of a violation of 18 U.S.C. § 1505 (Obstruction of Congress) and one count of a violation of 18 U.S.C. § 1001(a)(2) (False Statements).  The Rainey Indictment is predicated upon similar facts as those to which BP pled guilty, which are detailed in part in Section VI.H above.

### K. BP Has Agreed to Pay $525 Million to Settle the SEC's Charges That the Company Misled Investors Regarding the Oil Spill Flow-Rate

221.   On November 15, 2012, the SEC announced that BP agreed to pay a $525 million penalty into a fair fund for the benefit of investors damaged by the Company's misrepresentations concerning the oil spill flow rate in the aftermath of the *Deepwater Horizon* blowout.  The penalty is the third largest in SEC history.

222.   As alleged herein, the SEC Complaint alleged that BP made false or misleading statements in Forms 6-K filed with the SEC on April 29, April 30, and May 4, 2010 that the estimated flow rate was up to 5,000 barrels per day.  In addition, the SEC Complaint alleged that Defendant Suttles (referred to as Executive B therein) made materially false and misleading statements between April 29 and May 22, 2010 on ABC's *Good Morning America*, NBC's *Today Show* and CBS's the *Early Show*, on NPR's *Weekend Edition*, and at Unified Command press briefings reiterating BP's 5,000 barrels per day estimate.  According to the SEC Complaint, contrary to these representations, Rainey (referred to as Executive A therein) and BP engineers and contractors prepared numerous analyses and estimates during this time period estimating the oil spill flow rate to be as high as 146,000 barrels per day, with many other estimates coming in well above the 5,000 barrel per day number reiterated publicly by Defendants.

### L. Defendants Were Motivated to Conceal the Amount of Oil Spewing Into the Gulf to Reduce Fines and Penalties by Billions of Dollars

223.   Defendants were motivated to lie about the amount of oil gushing into the Gulf following the Macondo well explosion to reduce the amount of civil fines and penalties owed as a result of BP's gross negligence.  Civil fines under the U.S. Clean Water Act are based on the number of barrels spilled.  According to the *Wall Street Journal*, the final government estimate of the amount of oil spilled was between 53,000 and 62,000 barrels of oil per day, or 4.9 million

barrels spilled, which translates to $5.4 to $21 billion in fines depending on whether investigators find that the company was grossly negligent.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

224.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Maryland SRPS.   The price of BP ADSs and ordinary shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, materialized, causing a correction in the price of BP ADSs and ordinary shares resulting in Maryland SRPS suffering losses.   As a result of transactions in BP's securities during the Relevant Period, Maryland SRPS suffered damages, under the federal securities laws and English common law.

225.   The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the *Deepwater Horizon* and BP's failed efforts to control the resulting oil spill.   Immediately prior to the explosion, BP's ADSs traded at approximately $60.48 per ADS, and its ordinary shares traded at 655.4 pence on the LSE.   Following the explosion, BP ADSs and ordinary shares began a nearly continuous decline as the artificial inflation created by the Defendants' misrepresentations and material omissions was removed from the price of the securities.

226.   On April 26, 2010, government officials announced that attempts to stop the spill had failed and that oil was flowing into the Gulf of Mexico.   This news caused the price of BP securities to plummet.   Specifically, BP's ADSs declined $1.97 per ADS, from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, while BP's ordinary shares fell from 639.7 pence per share on the LSE on April 23, 2010, to close at 626.8 pence per share on April 26, 2010, a decline of 12.9 pence per share.   The declines are directly related to the market absorbing information revealing risks Defendants concealed throughout the

Relevant Period, namely, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

227.    After the market closed on April 28, 2010, NOAA held a press conference during which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day – five-times greater than that previously estimated by BP.  On April 29, 2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national significance."  This news caused the price of BP securities to fall again.  Specifically, BP ADSs fell from a closing price of $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%, while BP ordinary shares fell from 625.0 pence per share on the LSE on April 28, 2010, to 584.2 pence per share on April 29, 2010, a decline of 40.8 pence per share.  The declines are directly related to the market absorbing information revealing risks Defendants concealed throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan, and that the Company's statements about reforming BP's safety profile were false, as were the Company's statements about the amount of oil believed to be spilling into the Gulf on a daily basis.

228.    On April 30, 2010, when the oil slick caused by the disaster reached Louisiana's coastline, BP ADSs closed at $52.15 per ADS, a decline of over $8.00 per ADS since April 20, 2010.  BP's ordinary shares had declined nearly 80 pence per share over the period.  The declines are directly related to the market absorbing information revealing risks Defendants concealed throughout the Relevant Period, specifically that the Company conducted its

operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

229.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis further revealing BP's wanton disregard for conducting its operations in a safe manner and the lack of any legitimate spill response plan by BP.  These revelations caused BP's ADSs and ordinary shares to plummet further.

230.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, Hayward stated: "This is not our accident, but it's our responsibility."  The Company's ADSs fell from $52.15 to $50.19, a decline of 3.8%.  The Company's ordinary shares were not traded on the LSE on May 3rd, due to a holiday, but closed at 575.5 pence per share on April 30, 2010, and opened at 546 pence per share on May 4, 2010, representing a decline of 5.1%.  The decline is directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

231.    On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well.  On May 8, 2010, BP disclosed that the containment dome efforts had failed.  At this time, tar had begun to wash up on the Alabama coast.  On May 10, 2010, BP released a statement updating the public on the Gulf of Mexico oil spill response and revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS; BP's ordinary shares fell from 553.9 pence per share to 549.2 pence per share over the same period.  The decline is directly related to the

market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

232.    On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated, in relevant part:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.
>
> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf.   The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.
>
> *              *              *
>
> *"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said. "We now know those assurances were wrong."*
>
> *              *              *
>
> **'Serious Questions'**
>
> "BP promised to make safety its number one priority," Stupak said. "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment.  The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

233.    These revelations caused BP ADSs to close at $48.50 per ADS on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.98 per ADS since April 20, 2010.  Similarly, BP's ordinary shares in London closed at 541.6 pence per share that day—down 3.9 pence per share from the previous day and 113.8 pence per share (-17.4%) in comparison to April 20, 2010.

234.    On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig."  This article stated, in relevant part:

> Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed *Deepwater Horizon* rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

235.    On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price.  This decline is directly related to the market learning of BP's process safety deficiencies.

236.    On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says."  This article stated, in relevant part:

> BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration.  *Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.*
>
> *Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak.  He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.*
>
> "It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

237.    On May 14, 2010, due to these revelations, BP's shares dropped $1.23 per ADS from the previous day's closing price to close at $46.87 per share; BP ordinary shares dropped 17.40 pence per share to close at 530.20 per share over this same period. The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a

legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

238.    On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million.  Additionally, BP announced that it was recovering less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, the Company's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS; BP's ordinary shares fell from 506.7 pence per share to close at 493 pence per share on May, 24, 2010.

239.    On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill mud into the well so that it reduced the pressure in and then the flow from the well.

240.    On May 27, 2010, the Flow Rate Technical Group, a group comprised of engineers and scientists from various federal agencies and universities that was tasked with creating its own estimate of the oil spill rate from *Deepwater Horizon*, issued a public report estimating the oil spill flow rate to be between 11,000 and 25,000 barrels per day.  In response to this news, the price of BP ADSs fell $1.74 per ADS in after-hours trading, from a closing price of $45.38 on May 27, 2010, to open at $43.64 per ADS on May 28, 2010.  The stock fell throughout the day on May 28, 2010 as the market continued to digest this information, closing at $42.95 per ADS, for a total loss of $2.43 per ADS or 5.35%.  Similarly, BP's ordinary shares fell in after-market trading from a closing price of 520.80 pence per share on May 27, 2010 to open at 517.00 pence per share on May 28, 2010, and continued to fall throughout the day on May 28, 2010, to close at 494.80 pence per share, for a total loss of 26 pence per share or 4.99%.

241.    On May 29, 2010 (a Saturday), BP revealed that its "top kill" efforts had failed.

242.    Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.
>
> *        *        *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

243.    On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP.  News of the Attorney General's action and BP's inability to cap the well with its "top kill" procedure sent its ADSs tumbling nearly 15%, to close on June 1, 2010 at $36.52 per ADS, on heavy trading volume.  Likewise, the Company's ordinary shares fell 64.8 pence over the period to close at 430 pence.  This closing price on June 1, 2010 represents a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010, or approximately 40%.  Moreover, the decline over this period in BP's ordinary shares was more than 225 pence per share, representing a decline of more than 34% since the closing price on April 20, 2010.  These declines are directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

244.    Governmental investigations following the oil spill have primarily blamed BP for the initial explosion and the ensuing oil spill.  For example, the Interior Department Report (dated September 14, 2011) states:

The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of *poor risk management*, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the *Deepwater Horizon*.

BP, as the designated operator under BOEMRE regulations, *was ultimately responsible* for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.

245.    The cost of the spill has been highly material.  To date, BP has set aside $37.2 billion to pay spill-related expenses.

## VIII. <u>RELIANCE</u>

246.    Maryland SRPS, acting in and from its home state, Maryland, by and through its investment advisers, justifiably and reasonably relied on some or all of the alleged false and misleading statements and omissions described above in purchasing and selling BP securities during the Relevant Period by, among other things: (1) reading the statements made by Defendants in BP's SEC filings, press releases and other public sources by BP executives; (2) reviewing analyst reports and news articles about BP; and (3) relying on the assumption that BP's stock price reflected truthful and accurate information disseminated by or on behalf of the Company and had not been impacted by false or misleading information.  Neither Maryland SRPS nor its investment advisers knew, or in the exercise of reasonable diligence, could have known of Defendants' false and misleading statements and omissions when transacting in BP securities during the Relevant Period.

247.    Maryland SRPS, acting in and from the State of Maryland, authorized certain parties, among others, to act as its investment advisers and managers and in that capacity to make investment decisions on its behalf during the Relevant Period (the "Maryland SRPS Investment Advisers").

248.     The Maryland SRPS Investment Advisers employed a fundamental research-based approach to investing the assets of Maryland SRPS during the Relevant Period, including in BP securities.  As such, it was the regular practice of the Maryland SRPS Investment Advisers to read and rely upon publicly available information concerning potential investments, including annual reports, Forms 20-F and other SEC filings, press releases, and/or other company statements and public information when making investment decisions, including investment decisions on behalf of Maryland SRPS.

249.     The Maryland SRPS Investment Advisers read and reasonably and justifiably relied upon some or all of the material misrepresentations and omissions of fact alleged herein and, on that basis, purchased BP securities on behalf of Maryland SRPS during the Relevant Period.

250.     Maryland SRPS, through the Maryland SRPS Investment Advisers identified above and other investment advisers, also relied upon the market price for BP securities in making investment decisions with respect to BP securities during the Relevant Period, and the assumption that BP's stock price reflected truthful and accurate information disseminated by or on behalf of the Company that had not been impacted by false or misleading information.

251.     During the Relevant Period, Maryland SRPS, acting through its investment advisers, including those identified above, and others, purchased BP ordinary shares in December 2008, January 2009, June 2009, September 2009, October 2009, November 2009, December 2009, and January 2010.

252.     Maryland SRPS suffered combined damages totaling more than $15 million in connection with its BP ADS and ordinary share purchases, as a result of the misconduct alleged herein.

253. The Maryland SRPS Investment Advisers did not, and in the exercise of reasonable diligence could not, have known of Defendants' false and misleading statements and omissions set forth herein, when transacting in BP securities on behalf of Maryland SRPS during the Relevant Period.

254. Had the Maryland SRPS Investment Advisers known the truth about BP's deficient drilling safety practices, failure to implement the Baker Report recommendations, inability to respond to an oil spill like the *Deepwater Horizon* disaster, and the true scope of the spill, they would not have purchased BP securities on Maryland SRPS's behalf during the Relevant Period, at least not at the prices paid.

255. As a publicly-traded company Defendants knew, understood and had reason to expect that: (1) investors would rely on the price of BP securities as reflecting accurate information known to the company and its principals; and (2) their misstatements would artificially inflate the price of BP securities and cause Maryland SRPS and/or its agents to purchase BP securities at such artificially inflated prices.

256. Maryland SRPS will also rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(1) Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(2) The omissions and misrepresentations were material;

(3) The Company's securities traded in efficient markets;

(4) The misrepresentations alleged would induce a reasonable investor to misjudge the value of the Company's securities; and

(5) Maryland SRPS, through its investment advisers, purchased BP securities during the Relevant Period without knowledge of the misrepresented or omitted facts.

257.    At all relevant times, the market for BP securities was efficient for the following reasons, among others: (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## IX.    NO SAFE HARBOR

258.    Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Relevant Period were ineffective to shield those statements from liability.

259.    The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of BP who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    MARYLAND SRPS'S CLAIMS ARE TIMELY

260.    Maryland SRPS's claims are filed within the applicable statutes of limitations and/or are otherwise subject to tolling.  Maryland SRPS did not know, and in the exercise of reasonable diligence could not have known, of Defendants' fraud and deceit prior to April 20, 2010 when it began to be revealed.

XI.    **CLAIMS FOR RELIEF**

261.    The federal law Claims set forth below (Claims 1 and 2) relate exclusively to Maryland SRPS's purchases of BP ADSs and are not brought in the alternative to any other Claims.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against BP, BP Exploration, Hayward and Suttles (the "Section 10(b) Defendants")**
**(RELATING TO ADS PURCHASES)**

262.    Maryland SRPS repeats and re-alleges each and every allegation contained above as if fully set forth herein.

263.    During the Relevant Period, the Section 10(b) Defendants disseminated or approved the false statements specified herein (as attributed to them above), which they knew or recklessly disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264.    The Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Maryland SRPS and in connection with its purchases or acquisitions of BP ADSs during the Relevant Period.  As detailed herein, the misrepresentations contained in Defendants' public statements included statements relating to BP's integration of the recommendations set forth in the Baker Report, the scope and progress of BP's OMS implementation, the Company's (and its divisions') statements about their ability to respond to a "worst case" spill in the Gulf far in

excess of the amount of oil leaking from the Macondo well, and statements relating to the amount of oil leaking into the Gulf from the Macondo well during the Relevant Period.

265.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Maryland SRPS; made various false and/or misleading statements of material facts; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase or sale of BP ADSs, which were intended to, and did deceive Maryland SRPS, for the reasons set forth above.

266.    The Section 10(b) Defendants are liable for the materially false and misleading statements attributed to them as set forth above.

267.    As described above, the Section 10(b) Defendants acted with scienter in that they either had actual knowledge of the misrepresentations set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  Specifically, the Section 10(b) Defendants knew or were reckless in not knowing that BP was not, contrary to its public statements, implementing the recommendations set forth in the Baker Report, that OMS did not apply to all of BP's operations, that the Company's (and its divisions') statements about their ability to respond to a "worst case" spill in the Gulf far in excess of the amount of oil leaking from the Macondo well overstated BP's capabilities, and statements relating to the amount of oil leaking into the Gulf from the Macondo well during the Relevant Period were contradicted by BP's internal documents.

268.    Maryland SRPS has suffered damages in that, in direct reliance on the market price for BP ADSs, and integrity of the market, it paid artificially inflated prices for BP ADSs.

Maryland SRPS would not have purchased or otherwise acquired these ADSs at the prices it paid, or at all, if it had been aware that the market price had been artificially and falsely inflated by the Section 10(b) Defendants' materially false and misleading statements.

269.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Maryland SRPS suffered damages in connection with its purchases or acquisitions of BP ADSs during the Relevant Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act Against Hayward,**
**BP, BP America and Inglis (collectively, the "Section 20(a) Defendants")**
**(RELATING TO ADS PURCHASES)**

270.    Maryland SRPS repeats and re-alleges each and every allegation contained above as if fully set forth herein.

271.    The Section 20(a) Defendants acted as controlling persons of BP and BP Exploration within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of BP, BP America and BP Exploration's operations and/or intimate knowledge of the false and misleading statements disseminated by BP and BP Exploration and their officers to the investing public, the Section 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BP and BP Exploration, including the content and dissemination of the various statements which Maryland SRPS contends are false and misleading and/or omitted material information.  The Section 20(a) Defendants were provided with or had unlimited access to copies of BP's and BP Exploration's reports, press releases, public filings, oil spill response capabilities and other statements alleged by Maryland SRPS to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

272. In particular, each of the Section 20(a) Defendants either owned, or had direct and supervisory involvement, in the day-to-day operations of BP and BP Exploration and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

273. As set forth above, the Section 10(b) Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Maryland SRPS suffered damages in connection with its purchases of the Company's ADSs during the Relevant Period.

**THIRD CLAIM**
**Common Law Deceit Against BP and Hayward**
**(collectively, the "Common Law Deceit Defendants")**
**(RELATING TO ORDINARY SHARE TRANSACTIONS)**

274. Maryland SRPS hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

275. During the Relevant Period, the Common Law Deceit Defendants, individually and in concert with others, participated in the fraudulent scheme set forth herein and made (as attributed to them above), or caused BP to make, statements which, at the time and in light of the circumstances in which they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Maryland SRPS and the investing public.

276.    When making the false and misleading representations, the Common Law Deceit Defendants knew they were false or made them with reckless disregard for their truth.

277.    Because, among other reasons, BP is a public company which is required by law to make certain filings and statements regarding its operational and financial health for purposes of public transparency, the Common Law Deceit Defendants knew, understood and had reason to expect that their statements would be distributed to or available to Maryland SRPS and the investing public, and that investors, such as Maryland SRPS, and/or its investment advisers, would rely and had a right to rely on such statements.  The Common Law Deceit Defendants were required to present BP's operations and oil spill response capabilities in a fair and accurate manner in, among other documents, SEC filings, press releases and other public statements. Moreover, because BP and BP Exploration were involved in drilling for oil in the Gulf, the Common Law Deceit Defendants knew, understood and had reason to expect that statements regarding BP's oil spill response capabilities would be available to Maryland SRPS and the investing public, and that investors, such as Maryland SRPS and/or its investment advisers, would rely and had a right to rely on such statements.  In addition, Defendants were required to file Forms 20-F, Forms 6-K and other reports with the SEC pursuant to the Exchange Act, 15 U.S.C. § 78 *et seq*., which was enacted to protect investors such as Maryland SRPS from misrepresentations by public companies.  Thus, Defendants had reason to expect that Maryland SRPS and other members of the investing public would be influenced by and rely upon the statements in BP's SEC filings, as the class of persons intended by Congress to be protected by the Exchange Act.

278.    The Common Law Deceit Defendants made (as attributed to them above), or caused BP to make, the false and misleading representations with the intent that they be acted

upon by others, including investors and prospective investors in BP securities, such as Maryland SRPS and/or its investment advisers.

279.    Maryland SRPS and/or its investment advisers, relying upon the Common Law Deceit Defendants' statements containing the false and misleading information, the market price for BP securities and/or the integrity of the market, purchased BP securities at artificially inflated prices during the Relevant Period.

280.    Maryland SRPS and/or its investment advisers acted in reasonable and justifiable reliance on the Common Law Deceit Defendants' false and misleading statements, the market price for BP securities and/or the integrity of the market, without knowing that the Common Law Deceit Defendants' statements were false, when making investment decisions regarding BP securities.

281.    As a direct and proximate result of the Common Law Deceit Defendants' misrepresentations and omissions, Maryland SRPS suffered damages in connection with its purchases of BP securities during the Relevant Period.

282.    The Common Law Deceit Defendants' misrepresentations and omissions, as set forth herein, constitute deceit under English common law.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Maryland SRPS prays for relief and judgment as follows:

a.    Awarding compensatory damages and equitable relief in favor of Maryland SRPS against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b.    Awarding exemplary damages in favor of Maryland SRPS against all Defendants;

c.    Awarding Maryland SRPS its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Awarding Maryland SRPS such other and further relief as this Court may deem

just and proper.


Dated:  April 18, 2014                              Respectfully submitted,

                                                    **CALLIER & GARZA, L.L.P.**

                                                    /s/ *Bernardo S. Garza*
                                                    BERNARDO S. GARZA
                                                    SDT Bar No. 4779
                                                    State Bar No. 03663500
                                                    4900 Woodway, Suite 700
                                                    Houston, TX  77056
                                                    (713) 439-0248
                                                    (713) 439-1908 (fax)

                                                    *Liaison Counsel for Maryland SRPS*


                                                    **KESSLER TOPAZ MELTZER
                                                      & CHECK, LLP**

                                                    /s/ *Matthew L. Mustokoff*
                                                    MATTHEW L. MUSTOKOFF
                                                    DARREN J. CHECK
                                                    GREGORY M. CASTALDO
                                                    MICHELLE M. NEWCOMER
                                                    MARGARET E. ONASCH
                                                    280 King of Prussia Road
                                                    Radnor, PA 19087
                                                    (610) 667-7706
                                                    (610) 667-7056 (fax)

                                                    *Attorneys for Maryland SRPS*